### McINTOSH v. DILL et al.

No. 11865—Opinion Filed Feb. 7, 1922.

Rehearing Denied April 4, 1922.

(Syllabus.)

1. **Constitutional Law—Legislative and Judicial Powers — Control of Persons Non Sui Juris—Vested Rights.**

The requirements of a well-organized and civilized government require that the power to control the persons and property of those non sui juris, such as infants, lunatics, and those held incompetent, and being such persons as are incapable of contracting themselves, must be vested somewhere, and this power rests primarily in the people as parens patriae and their legislative department of government, and it continues to reside in such department until the people, by their Constitutions, have taken it from the Legislature and vested it elsewhere, and most generally, in such instances, in the courts. The Legislature itself may vest it in the courts. Where such jurisdiction is vested in the courts by the Constitution, the Legislature cannot infringe upon such constitutional jurisdiction. Where the Legislature itself grants the power to the courts, it having the power to give, it has the power to take away. The only limitation on this legislative power is that if rights have become vested under the grant of a power, the Legislature cannot encroach upon such vested right by enactments that affect or destroy such vested rights.

2. **Same—Vested Rights — Indians — Removal of Restrictions.**

The Congress of the United States, so long as it possesses jurisdiction of an Indian or Indian Tribe, has the power to place restrictions upon alienation of the lands of such Indian or tribe, and at the same time the Congress has the power to remove such restrictions upon alienation, if in the judgment of Congress it is wise to do so, and the only limitation upon this power of Congress is that it cannot disturb, by its enactments, rights that have become vested under any former enactments, either in favor of the Indian or of third persons; and the exercise of such power by Congress, as thus defined

and limited, is not in contravention of the Fifth Amendment of the Constitution of the United States, which provides that no person shall be deprived of property without due process of law. This is upon the theory that no person can base a claim to a vested right in the denial of a right. A disability is not a property right, and the assertion of a vested interest therein is a legal fallacy. (Loman et al. v. Paullin, 51 Okla. 294, 152 Pac. 73.)

3. **Indians — Governmental Control — Relation of Parens Patriae.**

Indian Tribes and individual members thereof are primarily under the control and supervision of the Congress of the United States, and so long as this power subsists the Congress has plenary authority to control and direct the disposition of the property rights of the Indian as a member of a tribe or as an individual, and the doctrine of parens patriae applies to this relation between Congress and the Indians, that of guardian and ward, and is sovereign in its scope.

4. **Same—Powers of Congress — Removal of Restrictions on Allotment—Special Acts.**

Restrictions upon landed allotments of Indians arising by reason of enactments of Congress, whether based upon minority or degree of blood or both, is an exercise of plenary power of Congress heretofore defined, and being an exercise of the will and discretion of Congress, and Congress has equal unlimited power to remove such restrictions, as the judgment and discretion of Congress may dictate, and Congress may express this will by a general enactment or by a special enactment applicable to a particular Indian and affecting his particular allotment.

5. **Same — Special Act Validating Sale by Guardian.**

A proceeding pursued in a guardianship court seeking to convey title to an allotment or a portion thereof of a minor Indian whose lands at the time of such attempted involuntary conveyance are restricted as to alienation, such court at the time not being authorized thereunto by Congress, is a void proceeding, and a deed procured thereunder

is a nullity. But it is held that Congress, by a subsequent special act and while said Indian allottee is still under the jurisdiction of Congress and the allotted lands of said Indian, and their disposition are still under the control of Congress, may remove such restrictions and approve and validate said transaction and make the deed of force and· effect from its date.

Error from District Court, Okfuskee County; Lucien B. Wright, Judge.

Action in ejectment by Mildred McIntosh against W. H. and M, E. Dill. Judgment for defendants, and plaintiff appeals. Affirmed.

George C. Crump, Thos. H. Owen, and Alvin F. Molony, for plaintiff in error.

Gibson & Hull, T. H. Wren, Tom Hazelwood, and J. C. Wright, for defendants in error.

ELTING, J. This is an action in ejectment tried on an agreed statement of facts in the district court of Okfuskee county. A jury was waived. Judgment by the court was rendered in favor of the defendants in error, and the plaintiff· below, plaintiff in error herein, has appealed. The parties herein will be designated as plaintiff and defendants, as in the trial court.

The plaintiff is a three-fourths Creek Indian by blood, and is an allottee of the Creek Nation, and the land for which she sues is a part of her surplus allotment and described as follows: The north half of the southeast quarter of section 12, township 11 north, range 9 east, Okfuskee county, Okla. Plaintiff was born in June, 1898, and on the 23rd day of June, 1906, Bunny McIntosh, her father, was duly appointed her guardian by the United States Court for the Western District of the Indian Territory. He filed a petition in said court for authority to sell the land in question, and on the 9th day of July, 1907, the court made an order directing the guardian to make the sale. The sale of the land was sought as an addition to the town of Okemah, which is now the county seat of Okfuskee county, and the guardian caused the land to be platted into lots and blocks, streets, and alleys, and on the 27th and 28th days of September, 1907, the property was sold; in which sale divers and many persons became purchasers. From said sale plaintiff received more than $16,000, and the property has been improved and many homes placed thereon, and said property, including said improvements, has become of great value. estimated at $300,000. Defend-

ant W. H. Dill declares no claim to any interest in the property, but defendant M. E. Dill asserts ownership of lots 4, 5 and 6 of block 19. which are a part of the tract heretofore described, and upon which lots improvements have been placed to the value of $4,000 or more, and she deraigns her title back to the guardian's sale, and only those lots are involved in this particular action.

The plaintiff attained her majority on the 18th day of June, 1916, and brought this action on the 21st day of July, 1919, and as the gravamen of her suit contends that at the time the court ordered the sale to be made the· alienation of the land was restricted, and the order, therefore, being void, conferred no authority upon the guardian whatever to make said sale, and that hence the conveyance was a nullity.

Against this contention of the plaintiff, the defendant insists upon three grounds that the judgment of the trial court should be affirmed: First. That the Congress cured any defects in said title and vested the title in the purchasers ·by a special act of Congress passed June 25, 1910. and that said act had the effect of validating the title in the purchasers at said sale; said provision being section 26. volume 3, Kappler on Indian Laws and Treaties, page 482, and providing as follows:

"That all sales and conveyances made by Bunny McIntosh, legal guardian of Mildred McIntosh. a minor, mixed-blood Creek Indian, under decree of the United ·States Court of the Western District of Indian Territory. sitting at Wewoka, rendered on the 9th day of July, 1907, and sold on the 27th and 28th days of September, 1907, and conveying various portions of the north half of the southwest quarter of section 13, township 11 north, range 9 east,· of said lands and adjoining the town of Okemah, be and the same are hereby validated and all restrictions upon said lands heretofore placed by act of Congress are removed."

Second. The defendant contends that the plaintiff, Mildred McIntosh. after reaching her majority and on the 28th day of June, 1916, made a final settlement with her legal guardian and received from said guardian the proceeds from the sale of said lots, and that she thereby ratified the sale of said property and by said action estopped herself from setting up her claim to said property.

Third. The defendant invoked the statute of limitations, or that the plaintiff had delayed beyond the statutory period in filing

said suit, after the accrual of her cause of action.

Our holding in this case is such that it becomes necessary for us to consider but one of these contentions of the defendant in error. We hold that the act of Congress had the effect of validating the title of the defendant in and to said lots, as contended by the defendant, and that holding is decisive of this case and results in an affirmance of the judgment of the trial court.

We will now, as briefly as possible, give the reasons that have led us to this conclusion. There have been a great number of briefs filed in this case. Numerous authorities are cited pro and con and numerous and extensive quotations cited to this court relative to and bearing upon the power of Congress to pass a special validating act in an attempt to legalize this conveyance.

The contention of the attorneys for the plaintiff is that our governments, both federal and state, are divided into three co-ordinate departments; legislative, judicial, and executive; and that each is independent of the other, and that neither can infringe upon the functions of the other. That it is the function of the legislative to make laws; of the judicial to define and interpret; and of the executive to enforce; and that the effort of Congress to validate this transaction, being, as they contend, a judicial act, would be an act in excess of the authority of Congress and an infringement upon the judicial functions of the government in contravention of the "law of the land," which guarantees freedom of contract, and in contravention of the Fifth Amendment, which prohibits the depriving of private property without due process of law, and hence the act was unconstitutional.

We think the above is a fair statement of the contention of the attorneys for the plaintiff. At the outset we will state that if this act of Congress had the effect of doing the things contended by the attorneys for the plaintiff, we would be under the necessity of conceding their contention and disaffirming the judgment of the trial court; but we are unable to agree with the contention. The trouble with the contention of the plaintiff is that it is like many other general abstractions of the law; when considered in the light of the many and numerous exceptions that limit and narrow its effect and scope, it is often found not to apply to the particular facts and situations in the particular case. We will now undertake to show, first, the exceptions and limitations to said rule; and, secondly, after we have defined the scope and limitation of this proposition, we will then show that the instant case does not come within the contention of the plaintiff.

The legislative departments have the power to take private property for public uses, and in so doing are exercising what is called a sovereign power, and are unlimited unless restricted by constitutional provisions. The power is inherent in the people and the Legislature, and the limitation is that it must be taken for a public use. The Legislature may provide by general laws the method and procedure as to condemnation, and the acts may become, all, or in part, judicial, but it is nevertheless taking property without the consent of the owner; or, we are at least safe in saying it is taking property either with or without consent. Consent is not necessary. In the exercise of police power, property is often taken without consent.

We now come to a legislative function that is more directly in point with the contention in the instant case. Persons non sui juris have not the power to consent, but legal title to their property is made to pass every day, and the big guardian of these non sui juris is the people acting through their Legislatures. Most all the states in the Union have passed upon the proposition, holding that the Legislature can delegate to an agent the authority to convert property, both personal and realty, of those who are non sui juris, and no actual consent can be contemplated, because the owners in such instances are incapable of consent, and if consent is technically necessary, a presumed consent is sufficient.

Some states, under their constitutional provisions, hold that the Legislature must pass general provisions authorizing guardians generally to convey. The rule thus stated is expressed in 4 N. H. 572-3, in an opinion delivered by the Supreme Court of New Hampshire in answer to an interrogatory by the House of Representatives of that state. The interrogatory and a portion of the answer thereto were as follows:

"The last question is, 'Can the Legislature authorize a guardian of minors, by a special act or resolve, to make a valid conveyance of the real estate of his wards?'

"The objection to the exercise of such a power by the Legislature, is, that it is in its nature both legislative and judicial. It is the province of the Legislature to prescribe rule of law, but to apply it to particular cases, is the business of the courts of

law. And the thirty-eighth article in the Bill of Rights, declares that 'in the government of this state, the three essential powers thereof, to wit: the legislative, executive, and judicial, ought to be kept as separate from, and independent of, each other, as the nature of a free government will admit, or as is consistent with that chain of connection that binds the whole fabric of the Constitution in one indissoluble bond of union and amity.' The exercise of such a power by the Legislature can never be necessary. By the existing laws, judges of probate have very extensive jurisdiction to license the sale of the real estate of minors by their guardian. If the jurisdiction of the judges of probate be not sufficiently extensive to reach all proper cases, it may be a good reason why that jurisdiction should be extended; but can hardly be deemed a sufficient reason for the particular interposition of the Legislature in an individual case. If there be a defect in the laws, they should be amended. Under our institutions all men are viewed as equal, entitled to enjoy equal privileges, and to be governed by equal laws. If it be fit and proper, that license should be given to one guardian, under particular circumstances, to sell the estate of his ward, it is fit and proper that all other guardians should, under similar circumstances, have the same license. This is the very genius and spirit of our institutions. And we are of opinion that an act of the Legislature to authorize the sale of the land of a particular minor, by his guardian, cannot be easily reconciled with the spirit of the article in the Bill of Rights which we have just cited."

In other states it has been held that the Legislature may pass special acts directing guardians and those acting in fiduciary capacity to convey property held in trust.

In the case of Brevoort et al. v. Grace et al., 53 N. Y. 245, the first paragraph of the syllabus reads as follows:

"The Legislature has power by special statute to authorize the sale of the lands of infants, and this power extends to the future contingent interests of those not in being, but it has no power to authorize, without their consent, the sale of lands in which adults, competent to act for themselves, have an interest, vested or contingent, unless a sale be necessary for the payment of taxes and assessments."

From the body of said opinion we quote the following, from page 259:

"An owner sui juris is equally competent to determine and manage for himself in the one case as in the other. The foundation of the power of the Legislature to act in behalf of any owner is the want of capacity to act for himself, and this reason no more extends to the case of a contingent

than to a vested expectant estate. The question as to whether the interests are vested or contingent is not material and will not be discussed."

We also take the following excerpt from the same opinion, pages 255-56:

"In the case last cited, the learned judge concedes the power of the Legislature, in acting as the guardian and protector of those incapable of acting for themselves by reason of infancy, lunacy, etc., to pass general or special laws under which an effectual disposition of their lands and other property may be made in order to promote their interests; and, after an allusion to the fact that, in England, private acts of parliament are a mode of assurance, proceeds to say that here the sovereign and absolute power resides in the people, and that the Legislature can exercise such powers only as have been delegated to it. The right of eminent domain or inherent sovereign power gives the Legislature control of private property for public uses, and only for such uses; in such cases, the interest of the public is deemed paramount to that of any individual, and yet, even here, the Constitution of the United States and the Constitution of this state have imposed a salutary check upon the exercise of legislative power for that purpose, by providing that private property shall not be taken for public use without just compensation. It follows that if the Legislature should pass an act to take private property for a purpose not of a public nature, or if it should provide, through certain forms to be observed, to take the property of one and give it or sell it, which is the same thing in principle, to another; or, if it should vacate a grant of property under the pretext of some public use, such cases would be gross abuses of the discretion of the Legislature and fraudulent attacks on private rights, and the law would be clearly unconstitutional and void."

In said opinion, the case of Liggett v. Hunter, 19 N. Y. 446, is distinguished and limited.

The inferences that we draw from reading and reviewing a large number of cases upon this question are that as to persons non sui juris, such as infants and those legally declared incompetent, the Legislature has the inherent power to authorize guardians to sell the property in their charge, and what they have the power to do by delegated authority, they have the power to do by an act of the Legislature, unless restricted in both these particulars by constitutional restrictions of their respective states.

In New Hampshire, according to the case just cited and quoted from, found in 4 N. H. 572, the Legislature of that state seems to be constitutionally restricted in

this regard; while in New York, at least up to the time of the decision of Brevoort et al. v. Grace et al., the Legislature of New York does not seem to be so constitutionally restricted.

The rule is discussed and the principle we have discussed and suggested above is laid down on page 143 of Cooley's Constitutional Limitations (7th Ed.) as follows:

"If this be not true, then the general laws under which so many estates of minors, persons non compos mentis, and others, have been sold and converted into money, are unauthorized by the Constitution, and void. For the courts derive their authority from the Legislature, and, it not being of judicial nature, if the Legislature had it not, they could not communicate it to any other body. Thus, if there were no power to relieve those from actual distress who had unproductive property, and were disabled from conveying it themselves, it would seem that one of the most essential objects of government—that of providing for the welfare of the citizens—would be lost. But the argument which has most weight on the part of the defendants is, that the Legislature has exercised its power over this subject in the only constitutional way, by establishing a general provision; and that, having done this, their authority has ceased, they having no right to interfere in particular cases. And if the question were one of expediency only, we should perhaps be convinced by the argument, that it would be better for all such applications to be made to the courts empowered to sustain them. But as a question of right, we think the argument fails. The constituent, when he has delegated an authority without an interest, may do the act himself which he has authorized another to do so; and especially when that constituent is the Legislature, and is not prohibited by the Constitution from exercising the authority. Indeed, the whole authority might be revoked and the Legislature resume the burden of the business to itself if in its wisdom it should determine that the common welfare required it. It is not legislation which must be by general acts and rules, but the use of a parental or tutorial power, for purposes of kindness, without interfering with or prejudice to the rights of any but those who apply for specific relief. The title of strangers is not in any degree affected by such an interposition."

When the person is sui juris and owns the property in absolute and unqualified fee, in such a status the Legislature has not the power by its fiat to declare the title of property thus vested in A., a sui juris, to be in B. The attorneys for the defendants in error rely upon the case of Wilkinson v. Leland, rendered by Mr. Justice Story,

in the United States Supreme Court, in 1820, and found in 2 Pet. 627. In this case Mr. Justice Story states the following, quoting from page 657:

"We know of no case, in which a legislative act to transfer the property of A. to B., without his consent, has ever been held a constitutional exercise of legislative power in any state in the Union. On the contrary, it has been constantly resisted, as inconsistent with just principles, by every judicial tribunal in which it has been attempted to be enforced. We are not prepared, therefore, to admit that the people of Rhode Island have ever delegated to their Legislature the power to divest the vested rights of property, and transfer them without the assent of the parties. The counsel for the plaintiffs have themselves admitted that they cannot contend for any such doctrine."

This opinion by Mr. Justice Story is very interesting. Whipple, Webster, and Wirt appeared in this case. The opinion is not very long, and the facts are briefly these:

A party died in New Hampshire leaving a will and a considerable estate, both personal and real, also leaving debts more than the personal property would pay. Some of the realty was located in New Hampshire and some in the state of Rhode Island. The laws of both states provided that creditors of the estate had a claim on the real property of the deceased if there were not personal property sufficient to satisfy debts. The executrix qualified as such in the state of New Hampshire, but did not so qualify in Rhode Island, but went into the state of Rhode Island and negotiated a private sale of the real estate located in Rhode Island. The purchasers doubted the validity of the deed and required a bond or title and required the executrix to go to the Legislature of Rhode Island and get a special act validating the conveyance. This she did. The heirs came in and attacked the conveyance. It was appealed to the Supreme Court, and Mr. Justice Story held the act valid on the theory that it was remedial and did not take a vested right since it perfected the lien of the creditors, and those claiming, taking subject to such lien, could not assert that their property was taken without due process and contrary to the laws of the land.

In his opinion Mr. Justice Story stated that if the claimants had possessed an absolute fee simple title, he could not have held the act remedial and could not have declared it valid. The following is a brief excerpt from said opinion found on pages 660 and 661:

"But it is said that this is a retrospective act which gives validity to a void transaction. Admitting that it does so, still it does not follow that it may not be within the scope of the legislative authority, in a government like that of Rhode Island, if it does not divest the settled rights of property. A sale had already been made by the executrix under a void authority, but in entire good faith (for it is not attempted to be impeached for fraud), and the proceeds, constituting a fund for the payment of creditors, were ready to be distributed as soon as the sale was made effectual to pass the title. It is but common justice to presume that the Legislature was satisfied that the sale was bona fide, and for the full value of the estate. No creditors have ever attempted to disturb it. The sale then was ratified by the Legislature, not to destroy existing rights, but to effectuate them, and in a manner beneficial to the parties. We cannot say that this is an excess of legislative power, unless we are prepared to say, that in a state not having a written Constitution, acts of legislation, having a retrospective operation, are void as to all persons not assenting thereto, even though they may be for beneficial purposes, and to enforce existing rights. We think that this cannot be assumed as a general principle, by courts of justice. The present case is not so strong in its circumstances as that of Calder v. Bull, 3 Dall. Rep. 386, or Rice v. Parkman, 16 Mass. Rep. 226; in both of which resolves of the Legislature were held to be constitutional."

Webster contended in this case that the effect of the said act was to contravene the law of the land guaranteeing freedom of contract, and that it consisted of taking property without due process of law, the same as is contended by the attorneys for the plaintiff in the instant case.    Mr. Justice Story admits in the opinion that if the act had the effect as contended by Webster, he would have to hold the act invalid, and this would be so without regard to the fact that Rhode Island had no written Constitution with the three independent departments of government (Rhode Island at the time of said transaction having no formal written Constitution, but acting under the King's charter), since Webster would have a right to invoke these propositions with or without a written Constitution; and Webster's contention, Mr. Justice Story stated in the opinion, should be regarded in the light and spirit of representative government that was then in vogue in this Nation. But Mr. Justice Story refused to agree with Webster that his principle applied in the particular case; stating that it was not the taking of a vested right, but was remedial, as indicated by the quotations heretofore given from his opinion.

We give the further following excerpt from page 661 of said opinion as being pertinent:

"Hitherto, the reasoning of the court has proceeded upon the ground that the act of 1792 was in its terms sufficient to give complete validity to the sale and deed of the executrix, so as to pass the testator's title. It remains to consider whether such is its predicament in point of law.

"For the purpose of giving a construction to the words of the act, we have been referred to the doctrine of confirmation at the common law, in deeds between private persons. It is said that the act uses the appropriate words of a deed of confirmation, 'ratify and confirm,' and that a confirmation at the common law will not make valid a void estate or act, but only one which is voidable. It is in our judgment wholly unnecessary to enter upon any examination of this doctrine of the common law, some of which is of great nicety and strictness; because the present is not an act between private persons having interests and rights to be operated upon by the terms of their deed. This is a legislative act, and is to be interpreted according to the intention of the Legislature, apparent upon its face. Every technical rule, as to the construction or force of particular terms, must yield to the clear expression of the paramount will of the Legislature. It cannot be doubted that an act of parliament may by terms of confirmation make valid a void thing, if such is its intent. The cases cited in Plowden, 399; in Comyn's Dig. Confirmation, D; and in 1 Roll. Abridg. 583; are directly in point. The only question then is, What is the intent of the Legislature in the act of 1792? Is it merely to confirm a void act, so as to leave it void, that is, to confirm it in its infirmity or is it to give general validity and efficacy to the thing done? We think there is no reasonable doubt of its real object and intent. It was to confirm the sale made by the executrix. so as to pass the title of her testator to the purchasers."

The opinion by Mr. Justice Story was afterwards followed by the well-considered case of Watkins v. Holmes, Lessee, 16 Pet. 25, 60. See, also, Florentine v. Barton, 2 Wall. 210; Doe v. Douglass, 8 Blackf. 10.

This case by Mr. Justice Story is interestingly discussed in Cooley's Constitutional Limitations (7th Ed.) pages 145, 146. In this case decided by Mr. Justice Story none of the parties were non sui juris, and this phase of the case suggests another matter for brief elucidation. For this purpose we

will concisely restate the propositions that we have already concluded, in this wise:

In the handling of the estates of those non sui juris. this jurisdiction is primarily with the people and their Legislature. But the people, in their Constitutions, may restrict or may take away entirely from the Legislature this primary jurisdiction and give it to one or various courts, leaving to the Legislature only the power of fixing the procedure and the manner of the exercise of said jurisdiction. Not the right to infringe upon, but the power to direct the manner of its exercise. The scope and power of this primary jurisdiction so emasculated from the Legislature and given to the courts and the part still retained in the Legislature, therefore, depend upon the terms of each particular Constitution.

In the state of Oklahoma, the Constitution itself has fixed this probate jurisdiction in a particular court called the county court.

It must be borne in mind that the right of those sui juris to exercise their authority over their property given them by the laws of the land, guaranteeing freedom of contract and forbidding the taking of property without due process of law, does not come and arise entirely from constitutional provisions, but comes largely from the common law which the Parliament of England enforced, and the accepted rules of property which it interpreted and applied, and which our courts also enforce, only being modified to be in consonance with our theory of government and institutions.

These fundamental rights of the sui juris may, however, be enlarged and broadened, but it has not been the spirit and purpose of our constitutional provisions to limit or minimize, but rather to broaden and protect, but the tendency of our constitutional provisions have been to narrow and limit the powers of the Legislature in the exercise of this prerogative power, to control the property of those non sui juris and to place the determination of those rights in the judicial branch of the government rather than to retain it in the Legislature, and as Cooley has stated in the quoted provision of his Constitutional Limitations, given herein, and when considered as a question of expediency it was wise that this has been done.

The Legislature or the Congress can only act legislatively and politically, and not judicially, in the determination of the primary. rights, heretofore discussed, of those sui juris and arising from the law of the land

and that are vested in them by constitutional provisions and forbidden to the Legislature, and the same is also true in considering the powers of the Legislature and of the courts pertaining to those non sui juris where the written Constitutions have taken it from the Legislature and vested it in the courts; hence, the line or demarkation between what is a legislative act and what is a judicial act arising in this wise sometimes becomes difficult to determine.

Pertinent to this point, we take the following excerpt from the opinion in the case of Ashuelot Ry. Co. v. Elliott, 58 N. H. 451, quoting from page 458:

"It may be doubtful whether some acts are legislative or judicial; but in this case there is no doubt. The foreclosure of the mortgage of private property, like the rendition of a judgment on a bond secured by the mortgage, is a judicial act. It requires notice and an opportunity for a trial of the questions of the existence and amount of the debt, and the existence, legality, and effect of the mortgage. The foreclosure of 1861 would have been invalid if the decree, made by the Legislature, had been made by either of the other departments of the government. The extinguishment of the mortgagor's title by a special governmental decree, without consent, compensation, trial. or notice, is not an exercise of any constitutional power."

In this connection see, also, the case of Maxwell v. Goetschius, 40 N. J. L. 383. This is an able discussion of the line of demarkation, and is valuable for another reason: that it reviews the case of Wilkinson v. Leland et al., supra, applies and distinguishes it.

Under the Constitutions and laws as they now prevail in our system of government, the Legislature has not the power to infringe upon the constitutional jurisdiction of the courts, and this is true whether the property owner is non sui juris or sui juris. The Legislature has the power to pass remedial legislation and has the power to pass curative acts validating proceedings of the court where their validity is questioned upon grounds of irregularities or failure to comply with some particular procedure prescribed by the Legislature and which does not involve the constitutonal jurisdiction of the court.

The counsel for the plaintiff have cited in their briefs quite extensively from Cooley's Constitutional Limitations. In the case of Mitchell v. Campbell (Ore.) 24 Pac. 455, a curative act of the Oregon Legislature, curing defects of sales by executors and administrators, was attacked for reasons similar to those relied upon by the

plaintiff in this cause, and Cooley's Constitutional Limitations was cited and relied upon with other authorities by counsel representing the party opposed to the validity of the act. In replying to this particular citation, Mr. Chief Justice Thayer stated the following:

"They (the appellants), however, contend that the acts do not cure jurisdictional defects, and cite, among other authorities, the language of Mr. Cooley upon the subject in his work on Constitutional Limitations (page 457, Fifth Edition), where he says: 'A retrospective statute curing defects in legal proceedings, where they are in their nature irregularities only and do not extend to matters of jurisdiction, is not void on constitutional grounds unless expressly forbidden.'

"But the learned author did not mean by this that defects arising from a failure to set forth the necessary facts prescribed by statute to confer jurisdiction upon a court in regard to a particular matter could not be cured by subsequent legislation where the court had a general jurisdiction of the subject. He says at page 458, same work: 'The rule applicable to cases of this description is substantially the following: If the thing wanting or which failed to be done, and which constitutes the defect in the proceedings, is something the necessity for which the Legislature might have dispensed with by prior statute, then it is not beyond the power of the Legislature to dispense with it by subsequent statute. And if the irregularity consists in doing some act or in the mode or manner of doing some act which the Legislature might have made immaterial by prior law, it is equally competent to make the same immaterial by a subsequent law.'

"Also on page 471: 'But the healing statute must in all cases be confined to validating acts which the Legislature might previously have authorized. It cannot make good retrospective acts · or contracts which it had and could have no power to sanction in advance.'

"This last clause indicated very clearly what the author did mean by 'curing defects in legal proceedings where they do not extend to matters of jurisdiction.' He evidently meant matters not within the jurisdiction of the Legislature. That body could not cure a defect arising from failure to serve process in an action or suit in accordance with some prescribed mode, as it has no power to authorize an adjudication against the party to the action or suit without such service being made. A failure to acquire original jurisdiction over the person or property of a defendant in any case would doubtless come under the same rule. But where a court obtains jurisdiction over a special subject-matter given to it by law, as probate courts do over the estates of deceased persons after an executor or administrator of the estate has been duly appointed and qualified, and the court has proceeded to exercise its jurisdiction in regard to a matter connected therewith without having complied with the mode which the Legislature had prescribed, but which it could have dispensed with, then the proceeding of the court, although irregular and defective, could be confirmed by subsequent legislation when justice thereby would be promoted."

In the case last cited above, Mr. Brightley's note appended to the decision of the case of Wilkinson v. Leland, 2 Pet. 627, is quoted with approval, as follows:

"To the objection that such laws violate vested rights of property, it has been forcibly answered that there can be no vested right to do wrong. Claims contrary to justice and equity cannot be regarded as of that character; consent to remedy the wrong is to be presumed. The only right taken away is the right dishonestly to repudiate an honest contract or conveyance to the injury of the other party. Even where no remedy could be had in the courts, the vested right is generally unattended with the slightest equity."

Chapter 5, Cooley's Constitutional Limitations (7th Ed.), and notes attached thereto, beginning on page 124, are splendid discussions upon the principles we have discussed. The question as to when the Legislature has the power to pass a curative act and when not, as to when the Legislature is exercising the power to pass remedial acts and when they infringe upon the primary jurisdiction of a court and infringe a vested right, was decided by Mr. Justice Story in Wilkinson v. Leland, heretofore cited, and was the turning point in that case. We quote the following from Cooley's Constitutional Limitations (7th Ed.) pages 146, 147:

"This species of legislation may perhaps be properly called prerogative remedial legislation. It hears and determines no rights; it deprives no one of his property. It simply authorizes one's real estate to be turned into personal, on the application of the person representing his interest, and under such circumstances that the consent of the owner, if capable of giving it, would be presumed. It is in the nature of the grant of a privilege to one person, which at the same time affects injuriously the rights of no other.

"But a different case is presented when the Legislature assumes to authorize a person who does not occupy a fiduciary relation to the owner, to make sale of real estate to satisfy demands which he asserts,

but which are not judicially determined, or for any other purpose not connected with the convenience or necessity of the owner himself. An act of the Legislature of Illinois undertook to empower a party who had applied for it to make sale of the lands pertaining to the estate of a deceased person, in order to raise a certain specified sum of money which the Legislature assumed to be due to him and another person, for moneys by them advanced and liabilities incurred on behalf of the estate, and to apply the same to the extinguishment of their claims. Now it is evident that this act was in the nature of a judicial decree, passed on the application of parties adverse in interest to the estate, and in effect adjudging a certain amount to be due them, and ordering lands to be sold for its satisfaction. As was well said by the Supreme Court of Illinois, in adjudging the act void: 'If this is not the exercise of a power of inquiry, and that, too, ex parte and summary in its character, we are at a loss to understand the meaning of terms; nay, that it is adjudging and directing the application of one person's property to another, on a claim of indebtedness, without notice to, or hearing of, the parties whose estate is divested by the act. That the exercise of such power is in its nature clearly judicial, we think too apparent to need argument to illustrate its truth. It is so self-evident from the facts disclosed that it proves itself."

The notes to the above quotation are very enlightening upon the proposition. Note 1 reads as follows:

"It would be equally competent for the Legislature to authorize a person under legal disability—e. g. an infant—to convey his estate, as to authorize it to be conveyed by guardian. McComb v. Gilkey, 29 Miss. 146. (See, in this connection, Louisville, N. O. & T. R. Co. v. Blythe, 69 Miss. 939, 11 So. 111, 16 L. R. A. 251, and note on constitutionality of private statutes to authorize disposal of property.)"

The doctrine of parens patriae, to which we hereinafter make reference and application, may be defined as the inherent power and authority of a Legislature of a state to provide protection of the person and property of persons non sui juris, such as minors, insane, and incompetent persons. This power is broad enough to give the Legislature authority to transmute real estate into personal estate. The case of Texas Company v. Henry, 34 Okla. 342, 126 Pac. 224, approves the following doctrine expressed in Hoyt v. Sprague, 103 U. S. 613, 26 L. Ed. 585. Speaking with reference to an express act of the Legislature of Rhode Island, the Supreme Court says:

"The exercise of this power has been most conspicuous in that class of cases in which the Legislature has been called upon to act as parens patriae on behalf of lunatics, minors, and other incapacitated persons. Laws authorizing the sale of the estates of such persons have frequently been passed, and have been upheld as fairly within the legislative power. The passage of such laws is not the exercise of judicial power, although by general laws the discretion to pass upon such cases might be confided to the courts. But when it is not confided to the courts, the power exercised is of a legislative character; the Legislature making a law for the particular case. In some modern Constitutions the exercise of this power has been prohibited to the legislative department. But where not so prohibited, and where it has never been authoritatively condemned in the jurisprudence of the state, we cannot deny to the Legislature the right to exercise it in those cases in which it has been accustomed to be exercised."

In Watkins v. Holman, 16 Pet. 25, 10 L. Ed. 873, an act authorizing an administratrix residing in another state to sell land in Alabama for the purpose of paying debts was held by the Supreme Court to be within the legislative power and, therefore, valid.

In Louisville, N. O. & T. R. Co. v. Blythe, 69 Miss. 939, 11 South. 111, the following was stated by the court:

"The doctrine is firmly established by the great weight of American decisions, and sustained by the most cogent and unanswerable reasoning, that special acts of the Legislature authorizing or confirming the sale of lands by guardians are constitutional, when their object is simply to provide a change of investment, and not to divest the beneficiary of property rights, in the absence of special or exceptional constitutional limitations, and that such acts are not judicial, but the proper exercise of legislative power. Such a power necessarily resides in the legislative department of the government as parens patriae, to prescribe such rules and regulations as may be proper for the management, superintendence, and disposition of the property of infants, lunatics, and persons who are incapable of managing their own affairs."

In Davidson v. Johonnot, 7 Metc. (Mass.) 388, 41 Am. Dec. 448, the Massachusetts court stated the following:

"The statutes in these cases, it will be perceived, were obnoxious to the same objection now urged against the resolve before us. They are legislating for a particular case, dispensing with the general standing law in favor of an individual, and changing the legal title to real estate, taking it from one man and vesting it in an-

other, without judicial sentence or judgment by his peers.

"After much reflection upon the subject, we are not satisfied that the Legislature, in passing this resolve, transcended its constitutional powers. The act was not a judicial one. The proceeding does not deprive the party of his property, or the avails thereof, being wholly secured for his benefit. It was an act passed by the Legislature upon the application of Davidson's guardian, the person whom the law had placed as the legal representative to watch over and protect the interest of the ward, and must be assumed to have been done, not adversely to his interest, but for his benefit."

One of the leading cases on this proposition seems to be Rice v. Parkman, 16 Mass. 326. In this last case it was held that the Legislature had authority to pass an act licensing the sale of a minor's real estate, notwithstanding there was a general act delegating the same power to the court. This holding of the Massachusetts court seems to be in consonance with the holding of the New York court and different from the holding of the New Hampshire court. The Massachusetts court discusses it as a parental or tutorial power resting in the Legislature, making that body alone competent to act as the guardian and protector of those unable to act for themselves.

The attorneys for the plaintiff in the instant case have given great consideration, as have the attorneys for the defendants in error, to the attitude of the courts of the various states on the questions involved herein. The inferences the plaintiff's attorneys undertake to draw from those cases and the analogy they seek to apply to the act of Congress in the instant case, we think, are the wrong ones, and the inferences that we draw and the analogy we are applying are the correct ones, and that is the doctrine of "parens patriae". The government, as represented by Congress, is the great parent, the great guardian, over its Indian wards, and while in the status of non sui juris, as defined by the acts of Congress.

We now come to the consideration of the powers of Congress relative hereto and the status of the plaintiff in this suit. If the plaintiff in this suit was non sui juris at the time of the passage of this statute, then she was subject to the power of Congress, and this jurisdiction of Congress is thoroughly recognized and well defined. That power is plenary, and the right of Congress to act in any instance, either in repealing laws pertaining to Indians in such status, invoking so-called "Indian treaties," placing on or taking off restrictions on alienation of Indian property, laying down the terms and conditions upon which their property may be alienated, designating who may act as the agents of Congress in carrying out its purposes and policy relative to the Indians, as far as it affects the Indian, is unlimited, and the only limitation that exists upon that power is that if vested rights accrue under any of the acts of Congress or treaties or agreements with Indians, Congress is forbidden to do anything to destroy those rights by repeal of those enactments. Neither has it the power to revoke a vested right arising in favor of the Indian under those agreements. Other than this, we know of no limitations upon the power of Congress to change and revoke its acts in relation to the Indians, who stand in relation to the government as wards and those non sui juris, and the government stands in relation to them as parens patriae, or as guardian.

Illustrative of these two propositions is that as to vested rights of third parties arising under treaties. The government may act in such a way under those treaties whereby property rights arise, and the government would be estopped to deny their validity as to the rights of the particular individual. This is well settled and needs no citation of authority.

An illustration of where an Indian has a vested right under agreement or treaty is that of his right to claim an exemption as to his allotments from taxation. See Choate v. Trapp, 224 U. S. 665, 56 L. Ed. 941, by Mr. Justice Lamar. It may be contended that when an Indian is granted an allotment and the title vests, that has the effect of vesting him with the rights of a citizen and that that takes him out of the control and care of Congress, but it has been held that the status of citizenship is not incompatible with the status of a tribal Indian or the continued guardianship of the government. This is defined in Eells v. Ross, 12 C. C. A. 205, 64 Fed. 417, and other authorities cited on page 186 of 47 L. Ed.

An act of Congress may supersede a treaty even with a foreign nation, and an Indian treaty is held to be of less dignity than is a treaty with a foreign nation. See Edye v. Robertson, 112 U. S. 580, and the authorities cited in the case just previously cited and the same page and the one following.

The plenitude of the powers of Congress and the supervisory powers over Indians is discussed in the case of Stephens v. Cherokee Nation, 174 U. S. 445. The case of Gritts v. Fisher, 224 U. S. 640, discusses these propositions. To the same effect is Sizemore v. Brady, 235 U. S. 441.

The plaintiff in the instant case was a three-fourths degree Indian of the blood and of the Creek Tribe. The special act of Congress validating this deed was dated the 25th day of June. 1910. Section 16 of the Supplemental Creek Agreement, which took effect on the 8th day of August, 1902, 32 Stat. at L. 503, provides as follows:

"Lands allotted to citizens shall not in any manner whatever or at any time be incumbered, taken, or sold to secure or satisfy any debt or obligation nor be alienated by the allottee or his heirs before the expiration of five years from the date of the approval of the Supplemental Agreement except with the approval of the Secretary of the Interior."

Section 4 of the Original Creek Agreement, which was ratified by the tribe on the 25th day of May, 1901, 31 Stat. at L. 861, provides:

"Allotment for any minor will be selected by his father. mother, or guardian in the order named and shall not be sold during his minority."

The provisions of section 4 of the Original Creek Agreement, not being inconsistent with any provisions of the Supplemental Agreement, are still in force and constitute additional restrictions on the alienation of lands of minors, which continued during the term of minority. Blakemore v. Johnson. 24 Okla. 544, 103 Pac. 554; Bragdon v. McShea, 26 Okla. 35, 107 Pac. 916; Hopkins v. U. S., 235 Fed. 95; U. S. v. Shock, 187 Fed. 862; Texas Company v. Henry, 34 Okla. 342, 126 Pac. 224; Stephens v. Elliott. 30 Okla. 41. 118 Pac. 407; Campbell v. Moseley. 38 Okla. 374, 132 Pac. 1098; Alfrey v. Colbert, 168 Fed. 231.

The five-year period of restriction on alienation as provided in section 16, of the Supplemental Agreement, expired on the 8th day of August, 1907, 30 days after the order of sale by the court and one month and 19 days before the guardian made the sale. But the restrictions on alienation for the term of minority as provided by section 4 of the Original Agreement continued and did not expire until the plaintiff attained her majority on the 18th day of June, 1916.

Plaintiff being a three-fourths degree Indian of the blood and the land being allotted land, Congress on the 27th day of May, 1908, section 1, 35 Stat. at L. 312, further restricted the alienation of the land by providing:

"All allotted lands of enrolled full-bloods and enrolled mixed bloods of three-fourths or more Indian blood, including minors of such degree of blood, shall not be subject to alienation, contract to sell, power of attorney, or any other incumbrances prior to April 26, 1931, except that the Secretary of the Interior may remove such restrictions," etc.

The conclusion is inevitable that the plaintiff in this suit, at the time this act of Congress was passed, was non sui juris and under the jurisdiction of Congress, both by reason of her minority and by reason of the restrictions against alienation arising from the specific acts of Congress and her three-fourths degree of Indian blood. The father of this plaintiff had been appointed her guardian in a United States court, and within the jurisdiction of which court she and the guardian resided. An act of Congress had placed the laws of the state of Arkansas pertaining to guardianship in force in the Indian Territory. The guardian undertook to convey title to this property in a proceeding in the United States court wherein he had been appointed guardian, by a legal procedure in compliance with the Arkansas law. There is no contention but that the law was complied with. There is no contention that there was any fraud perpetrated in the transaction, nor that ample consideration had not been received for plaintiff's property, nor that said guardian and the purchasers had not acted in good faith. It is contended, however, that the lands of the plaintiff, at the time of the order procuring the sale and the sale was made, was under restrictions as to alienation, and that the court making the order was totally without jurisdiction, and that the sale as made under said proceeding was an absolute nullity. This we admit to be true, and if the defendants had nothing but said deed to rely upon, they would be out of court. The title to this property was in the plaintiff as a part of her allotment at the time of the said purported sale. The only thing in the way of her passing title by involuntary conveyance, she being a minor, was the fact that Congress had forbidden an alienation. It was within the power of Congress to give power of alienation by removing restrictions and either to convey directly by a legis-

lative act or authorize some agency according to some procedure or no procedure to make conveyance. As before stated, the transaction was invalid. So was the transaction in the case of Wilkinson v. Leland, but the fact that the proceeding was invalid under the laws prevailing at the time is not to say that Congress had not the power to validate it and make the validation retroactive and as of the date of the transaction. Bear in mind that this plaintiff was non sui juris and under the absolute jurisdiction of Congress with ample and plenary power to make disposition of her property in any manner it thought best and most available.

It appears that Congress has rarely attempted to pass special acts as in the manner herein attempted, and has most generally directed the disposition of its 'wards' estates through some agency. We, therefore, have had no cases called to our attention where the action of Congress by a special bill has been called in question. We have cases, however, where we think the principle decisive in this case has been laid down and followed.

In Lykins v. McGrath, 184 U. S. 169, Congress by act of March 3, 1859 (11 Stat. 431), granted certain lands to certain of the Indian Tribes and imposed thereon the following restrictions:

"That said tracts shall never be sold, or conveyed by the grantee or his heirs without the consent of the Secretary of the Interior for the time being."

David Lykins, one of the Indian grantees, on June 3, 1864, conveyed the land granted him, without first obtaining the consent of the Secretary of the Interior, but on the 10th day of March, 1865, nearly a year thereafter, the Secretary approved the conveyance. Mr. Justice Brewer, rendering the opinion of the court, says:

"It must therefore be considered as settled that the consent of the Secretary of the Interior to the conveyance by one holding under patent, like the present, may be given after the execution of the deed, and when given is retroactive in its effect and relates back to the date of the conveyance. * * * The restriction was placed upon his alienation in order that he should not be wronged in any sale he might desire to make; that the consideration should be ample; that he should in fact receive it; that the conveyance should be subject to no unreasonable conditions or qualifications. It was not to prevent a sale and conveyance, but only to guard against imposition therein. When the Secretary approved the conveyance, it was a

determination that the purposes for which the restriction was imposed had been fully satisfied; that the consideration was ample; that the Indian grantor had received it, and that there were no unreasonable stipulations attending the transaction. All this being accomplished, justice requires that the conveyance should be upheld, and to that end the doctrine of relation attaches the approval to the conveyance and makes it operative as of the date of the latter."

To the same effect is the case of Pickering v. Lomax, 145 U. S. 310; Thompson v. Lee, 3 Wall. (U. S.) 328; Tiaco v. Forbes, 228 U. S. 549; Weed v. Donovan, 114 Mass. 181; Morris & Cummins v. State ex rel. Gussett, 62 Tex. 741; Nolan County v. State, 83 Tex. 184; Schneck v. City of Jeffersonville, 152 Ind. 205; Erskine et al. v. Steel County, 87 Fed. 630; Welch v. Wadsworth. 30 Conn. 149; Sanders v. Greenstreet et al., 23 Kan. 425; Smith et al. v. Callaghan, 66 Iowa, 552; Bonner v. Martin, 40 Ga. 501; State v. Kline, 23 Ark. 587; Estate of Henry Sticknoth, 7 Nev. 223; State v. Pool. 27 N. C. 105; Sidway v. Lawson, 58 Ark. 117; Louisville, New Orleans & Texas Ry. Co. v. Blythe et al., 69 Miss. 939; Felix v. Board of Co. Com'rs (Kan.) 62 Pac. 667; Mechanics', etc., Sav. Bank v. Allen et al., 28 Conn. 97; Curtis v. Leavitt, 15 N. Y. 9; State ex rel. Walter et al. v. Town of Union, 33 N. J. L. 350; Swartz v. Carlisle Borough, 237 Penn. St. 437; McSurely v. McGrew et al., 140 Iowa, 163; Walpole v. Elliott, 18 Ind. 259; Shields v. Clifton Hill Land Co., 94 Tenn. 124.

In the cited and quoted case of Lykins v. McGrath, wherein the restriction of Congress read as follows:

"That said tract shall never be sold or conveyed by the grantee or his heirs without the consent of the Secretary of the Interior for the time being"

—the consent of the Secretary of the Interior was not procured at the time the conveyance was made, and the approval of the Secretary was not granted for nearly a year thereafter. In the case of Pickering v. Lomax, the consent of the President was necessary as provided in the act of Congress. The consent of the President was not procured at the time of the conveyance and was not given for nearly 13 years after the conveyance, but the United States Supreme Court in both cases held that the subsequent consent related back to the date of the conveyance and validated it and would answer for and in lieu of an original consent.

In the instant case Congress could have given its consent to this sale. It had authorized an agent in these two cited cases to

give their consent, and what it could authorize an agent to do, it certainly could do directly. We know of no constitutional inhibitions on the powers of Congress to pass such an act and validate this proceeding. How can it be held that a restriction on alienation is a property right? We may well ask, How can any person have a vested right in a denial of a right, a limitation of a right?

Upon this subject the case of Loman v. Paullin, 51 Okla. 294, 152 Pac. 73, discussed and elucidated it as follows:

"We gather from the foregoing that counsel take the position that, by the Original Agreement, or treaty, approved by Congress and a vote of the Choctaws and Chickasaws, Loman acquired a vested right forever guaranteeing to him a restriction upon alienation of said lands. In other words, a vested right of disability—a new and most peculiar and novel proposition.

"We cannot agree with the counsel in their contentions in that behalf, nor can we agree with counsel that a person may acquire a vested right in that which amounts only to a disability, in this case, simply a restriction upon alienation. Our understanding has always been that the power which has the right to provide a restriction or any inhibition also has the power to remove it."

The fifth paragraph of the syllabus of the case is as follows:

"The original acts of Congress, treaties, and agreements, with the several tribes of Indians of the Indian Territory, which restricted any alienation of their lands or any part thereof, did not confer a vested right in such Indians to hold said lands free from alienation until the complete expiration and fulfillment of said acts of Congress, treaties, and agreements, with said Indians; and a subsequent act of Congress removing said restrictions upon alienation is not in violation of that part of the Fifth Amendment of the Constitution of the United States which provides that no person shall be deprived of property without due process of law. And held, further, that a citizen or ward of the government can acquire no vested rights in a statutory privilege, exemption, or disability, and the power which has a right to provide a restriction of disability also has the power to remove it."

We think this last cited case, with the authorities therein cited, is ample and sufficient to indicate the holding of this court. The reason this plaintiff did not have full power to convey was due to the will of Congress, and Congress willed subsequently to withdraw the inhibition. Congress, instead of undertaking to validate the prior proceedings, could have declared the restrictions removed, as it did do, and by the ex-ercise of its legislative fiat and in pursuance of its ample powers could have decreed the title in the purchasers. Instead of so doing, it declared the proceedings valid as of and from their date. The state Legislatures have been held to have the power either to delegate or by direct act convey the property of those non sui juris, and, as we have stated heretofore, in the absence of constitutional restrictions, this power primarily inheres in the legislative authority as the guardian of those incapable of contracting and consenting. We know of no reason why this power should not dwell in Congress in the absence of any constitutional inhibitions; besides, the authority is supported by a line of court decisions by the highest court of the Nation, without any variation, upholding and confirming this authority.

This opinion has extended to a great length, probably to an unnecessary length, but the importance of the propositions involved and the property interests, directly and indirectly involved, justify us in the full and complete consideration we have given the matter. As to the equities in this case, there is no doubt upon which side they lie. They are plainly and palpably in favor of the defendants.

Our decision has been in favor of the equities, and we believe that in following the equities we have also followed the law.

The judgment of the trial court is, therefore, affirmed.

PITCHFORD, V. C. J., and JOHNSON, McNEILL, and NICHOLSON, JJ., concur.