STATE OF INDIANA *v.* LEVITT ET AL.

[No. 30,611. Filed January 25, 1965. Rehearing denied March 15, 1965.]

*John J. Dillon,* Attorney General, *Carl E. Van Dorn,* Assistant Attorney General, *Thomas A. Hoadley,* Prosecuting Attorney, Tenth Judicial Circuit, of counsel, for appellant.

*John Wood* and *James B. Droege,* of Indianapolis, and *Ralph F. Fuchs,* of counsel, of Bloomington, for Indiana Civil Liberties Union, Amicus Curiae.

*Leonard B. Boudin, Rabinowitz & Boudin,* of New York City and *Daniel T. Taylor* of Louisville, Kentucky, and *Leonard B. Boudin,* and *Michael B. Standard,* of counsel, of New York City, for appellees.

ARTERBURN, C. J.—This is a criminal action commenced by a grand jury indictment of the appellees for the alleged violation of Section 5 of the Indiana Anti-Communism Statute, being the Acts of 1951, Ch. 226, §5, p. 648, as found in Burns' Ind. Stat. Anno. (1956 Repl.) §10-5205.

The indictment, following the wording of the statute, alleged that the appellees on May 2, 1963:

" . . . did then and there assemble for the purpose of advocating and teaching the doctrine that the government of the United States and of the State of Indiana should be overthrown by force, violence, and any unlawful means, voluntarily participating therein by their presence, aid and instigation, contrary to the . . . peace and dignity of the State of Indiana."

The appellees filed a motion to quash the indictment, based on the theory that the statute in question was invalid, primarily on the grounds that the Indiana statute had been superseded by federal legislation, namely, the *Smith Act* of 1940, 54 Stat. 670, as amended in 18 U. S. C. 2385, and that the Indiana statute violated the defendants' freedom of speech and assembly. This issue was narrowed by the appellees' motion requiring the State to state whether the alleged acts "related to both government of the United States and the government of the State of Indiana, or related merely to one of the said governments, and if so, to which one?"

The State answered that proof would be confined to acts relating to the State of Indiana and not the government of the United States of America.

The trial court sustained the motion to quash and found that the statute was unconstitutional and that the objection could not be avoided by a new indictment and discharged the defendants. From this judgment the State appeals.

The principal argument and the major question presented by this appeal is whether or not the Federal government has, by the *Smith Act,* preempted the entire area of criminal sedition applicable not only to the Federal government but also to the state governments. A subsidiary question is: If the Federal government has attempted also to cover this entire area of sedi-

tion and the violent overthrow of state governments, has it overreached its constitutional limitations under the original scheme of our government which provides:

> "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively or to the people." U. S. Const. Amend. X

Looking at the question here basically and disregarding the issue of preemption, every government must have the right of self-preservation and protection against sedition which advocates, foments and cultivates the violent overthrow of the government. Reviewing the history of our system of government, there are many reasons to conclude the Federal government is not the sole repository of this inherent power to the exclusion of the states, particularly in view of the powers reserved to the states by the Tenth Amendment. *State* v. *Raley* (1954), 100 Ohio App. 75, 136 N. E. 2d 295; 52 Am. Jur., *Treason*, §12, p. 801.

The question of free speech and assembly is incidental only to the decision of the main question. Free speech and assembly must yield in some instances to the more important right of self-preservation of a government against its overthrow by violence.

The main portions of the argument on both sides revolve around certain cases of the United States Supreme Court. These begin with the interpretation to be given the case of *Commonwealth of Pennsylvania* v. *Nelson* (1956), 350 U. S. 497, 76 S. Ct. 477, 100 L. Ed. 640.

This opinion was written by Chief Justice Warren on certiorari from the Supreme Court of Pennsylvania, with Burton, Minton and Reed, JJ., dissenting. In that case a prosecution was brought, based upon a statute in the State of Pennsylvania similar to that with

which we are concerned here in Indiana. It was contended there, as here, that the United States Act (*Smith Act* of 1940, as amended in 1948, 18 U. S. C. §2385) which prohibits the knowing advocacy of the overthrow of the government of the United States by force or violence, supersedes the similar Pennsylvania Sedition Act. That case pointed out that the right of the State to enforce sedition laws is not disputed when the Federal government either has not occupied such field or has specifically limited its jurisdiction to Federal cases. The opinion concludes with the statement:

> "Since we find that Congress has occupied the field to the exclusion of parallel state legislation, that the dominant interest of the Federal Government precludes state intervention, and that the administration of state Acts would conflict with the operation of the federal plan, we are convinced that the decision of the Supreme Court of Pennsylvania is unassailable." 350 U. S. 509, 76 S. Ct. 484, 100 L. Ed. 655.

The dissenting opinion states that there is no application of the doctrine of supersession excluding state legislation unless the legislation *conflicts* with a comprehensive federal act. It says that there is no conflict here, but rather cooperation between the state and Federal governments in the enforcement of such type of legislation.

The dissenting opinion further notes that the *Smith Act* appears in Title 18 of the United States Code. Section 3231 of that title provides:

> "Nothing in this title shall be held to take away or impair the jurisdiction of the courts of the several States under the laws thereof."

This is a simple, plain declaration of congressional intentions to avoid preemption of the entire field by Congress.

It is interesting to note, the majority opinion passes lightly over the plain and specific statutory expression of congressional intent in a footnote, and then proceeds to look for the congressional intent to occupy the entire field to the exclusion of the state governments by quoting from the public papers and addresses of Franklin D. Roosevelt, wherein the War President exhorted the American people to be attentive to subversive influences *during the war,* urging them to turn over all information of a subversive nature to the FBI in the interest of protecting our government against sabotage. The dicta in the majority opinion (the expressions of the executive division of government) is made the basis for determining the intentions of the legislative branch of government. We fail to see its relevancy and are not convinced by the reasoning.

A far more persuasive Supreme Court opinion is that of a case which followed. In *Uphaus* v. *Wyman* (1959), 360 U. S. 72, 79 S. Ct. 1040, 3 L. Ed. 2d 1090, the *Nelson* case, *supra,* was reviewed in an opinion written by Mr. Justice Clark, with Warren, C. J., Brennan, Black and Douglas, JJ., dissenting. There a question arose as a result of the refusal of a witness to produce certain documents for the New Hampshire legislative committee investigating subversive activities in the state. That case refined the *Nelson* case and stated:

" . . . The basis of Nelson thus rejects the notion that it stripped the States of the right to protect themselves. . . . The opinion made clear that a State could proceed with prosecutions for sedition against the State itself; that it can legitimately investigate this area follows a fortiori." 360 U. S. 76, 79 S. Ct. 1044, 3 L. Ed. 2d 1096.

It would thus appear to us that the dissenting opinion in the *Nelson* case was to some extent vindicated in the *Uphaus* case. It should be pointed out that in the

*Nelson* case the Court was concerned only with sedition alleged against the United States and not the state, while in the case before us, the state limited its prosecution to activites only against the State of Indiana.

Preemption by the Federal government by legislation which totally excludes a state government in such a field has no logical basis under the constitutionally-reserved powers of the state unless there is *an actual conflict* in the operation of such legislation, and there appears to be none in this case. *Cloverleaf Butter Company* v. *Patterson* (1942), 315 U. S. 148, 62 S. Ct. 491, 86 L. Ed. 754. As stated by Chief Justice Marshall, the conflict between the state and Federal legislation must be clear and direct in order for the Federal government to preempt the field to the exclusion of the state. *Cohens* v. *Virginia* (1821), 19 U. S. (6 Wheat.) 264, 443, 5 L. Ed. 257, 300.

We must conclude, therefore, that the decisions of the United States Supreme Court do not hold that the doctrine of preemption is applicable to the state's attempt to protect itself against subversive activities directed towards the violent overthrow of the state government. This is also the conclusion of most law writers on the subject.[1]

Other questions raised relate to the infringement upon the right of freedom of speech. We may observe that no right, constitutional, fundamental or otherwise, is absolute and unlimited in this society of ours—not even life and personal liberty—if we are to live with our neighbors. We are restrained on the streets and on the highways in our liberty of action. The police power intervenes in our daily relations with others to eliminate friction in order that the

---

1. 43 A.B.A.J. 131 (1957) Case Note, 28 Geo. Wash. L. Rev. 457 (1960) Note, 33 So. Cal. L. Rev. 93 (1959) Note, 38 Texas L. Rev 330 (1960) Note, 73 Harv. L. Rev. 126, 163 (1959)

actions of one person may not injure another member of society. Absolute and unlimited freedom in a society is only the reverse side of the coin of anarchy. No government of law and order would be possible under the doctrine of unlimited freedoms. Speech cannot, in an organized society, be totally unrestrained.

The brief amicus curiae in this case refers to the "freedom of organization among college and university students and their right to hear all shades of opinion expressed by outside speakers, . . . " Such activity in itself is not condemned by the legislation here in question. It is only when such persons "assemble for the purpose of advocating or teaching the doctrine that the Government . . . of the State of Indiana, should be overthrown by force [or] violence" that the law is violated. It is only when such meetings are used intentionally and knowingly as a vehicle or subterfuge for advocating the violent overthrow of a government that it becomes unlawful. No teacher has a right to hide behind the phrase "academic freedom" and use a classroom assembly to advocate the violent overthrow of a government, in violation of his sacred trust to the parents and citizens of the state that pay him. A state has the inherent right to take measures in self-preservation against any such activity, wherever it may take place—in the homes, in the schools or on the public square.

We do not intimate that any such activity has taken place on a college campus in this case. No evidence is before us, but the point was raised in one of the briefs and it is our duty to dispose of it.

The United States Supreme Court, in considering the *Smith Act*, disposed of this point. Chief Justice Vinson, speaking for the Court, said:

"The very language of the Smith Act negates the interpretation which petitioners would have

us impose on that Act. It is directed at advocacy, not discussion. Thus, the trial judge properly charged the jury that they could not convict if they found that petitioners did 'no more than pursue peaceful studies and discussions or teaching and advocacy in the realm of ideas.' He further charged that it was not unlawful 'to conduct in an American college and university a course explaining the philosophical theories set forth in the books which have been placed in evidence.' Such a charge is in strict accord with the statutory language, and illustrates the meaning to be placed on those words. Congress did not intend to eradicate the free discussion of political theories, to destroy the traditional rights of Americans to discuss and evaluate ideas without fear of governmental sanction. Rather Congress was concerned with the very kind of activity in which the evidence showed these petitioners engaged." *Dennis* v. *United States* (1951), 341 U. S. 494, 71 S. Ct. 857, 95 L. Ed. 1137.

It is next contended that there is "no clear and present danger" of the overthrow by violence of the government of the State of Indiana, and that it would be "ridiculous" to think anyone would "blow up the state capitol" without a concerted scheme to attack also the Federal government.

Incidentally, in this respect we may suggest that the wisdom of the legislative action in this case is amply justified by historical incidents.[2] Local state governments were overthrown by insurrection without direct attacks upon the Federal government during the Civil War. No one can foresee accurately when political strife

2. During the Civil War an organization known as the Knights of the Golden Circle, or Sons of Liberty, conspired to overthrow the state government of Indiana. The organization was arranging an invasion of the state with the Confederate commanders when the overthrow was thwarted by the arrest of some of the organization's leaders and the confiscation of guns and ammunition being shipped into the state for use of the Sons of Liberty. One of the arrested leaders applied to the United States Supreme Court for a writ of habeas corpus in *Ex Parte Milligan* (1866), 71 U.S. (4 Wall) 2, 18 L.Ed. 281.

may reach the point of violence. That a legislature has a duty to prepare for eventualities is borne out by the growth of Nazism under Hitler in Germany. It is obvious that such legislation cannot wait until the time arrives when the subversive powers are so strong that such legislation cannot be enacted or enforced. We speculate upon the turn of world events had such legislation been effectively enforced in Germany in the early days of Nazism.

Just how the so-called doctrine of "imminent danger" has any relevancy here is difficult to discern. The United States Supreme Court did not apply a test that a "clear and present danger" existed in: *Engel* v. *Vitale* (1962), 370 U. S. 421, 82 S. Ct. 1261, 8 L. Ed. 2d 601, 86 A. L. R. 2d 1285.

Our investigation of this pseudo doctrine convinces us that it has no place as a test of constitutionality. The most that can be said for the "idea" is that it is a principle applicable to the sufficiency of the evidence to sustain a conviction under the Subversive Acts. This is borne out by the statement in *Dennis* v. *United States, supra:*

" . . . Its reasoning was as follows: The 'clear and present danger' test was applied to the utterance itself in Schenck because the question was merely one of sufficiency of evidence under an admittedly constitutional statute."

We are further supported in this position by the statement in *Dennis* v. *United States, supra,* that the success or the probability of success is not required to create a clear and present danger of the overthrow of the government, justifying restrictions upon free speech.

It is next urged that the legislature could have achieved "the same basic purpose" by "less drastic means" and thereby not have infringed upon free speech to the same extent. *Shelton* v. *Tucker; Carr* v.

*Young* (1960), 364 U. S. 479, 81 S. Ct. 247, 5 L. Ed. 2d 231; *Aptheker* v. *Secretary of State* (1964), 378 U. S. 500, 84 S. Ct. 1659, 12 L. Ed. 2d 992.

The answer to such argument is that it is not the duty of the judiciary or the courts to speculate upon how unwise or even "ridiculous" legislation may appear to the courts, if the legislative body has the power and authority under the Constitution to enact such laws. To test the constitutional validity of a law by a standard that "less drastic means" might have been used, in our opinion is a blatant assumption of a legislative function. Under our scheme of government the legislature is given broad leeway and discretion in selecting the type of legislation it thinks best for the objective. The legislative branch of government is closer and more responsive to the people than the courts. It is supposed to better reflect the desires of the people, and through its investigative powers it is better able to determine policies to be followed and objectives to be attained. For us to intrude upon that field would be a violation of our oath and would result in substituting our judgment for that of the legislature.

Judges of higher courts, particularly, should be ever conscious that they are not the sole repository of wisdom and good judgment. A goodly, if not a major portion, of such talent and ability resides in both the legislative and executive branches of the government and under the Constitution they are given the functions of making determinations of policy. The suggested standards ("less drastic means") for the constitutional measurement of legislation turns over to the courts the discretion, judgment and wisdom which, by Constitution, is reposed with the legislative branch of government. Although we on the Court cannot always agree with the wisdom of legislation, we are sworn to and it

is our duty to uphold the right of the legislative branch of government in its functions.

Finally we observe that if supersession (preemption) were approved in this case, we feel the results would be absurd, if not chaotic. During argument it was stated that the United States Attorney General issued an order recently to all United States district attorneys that no prosecutions should be initiated or carried out under the *Smith Act* until further notice. Passing by the question of the right of any prosecuting official to pick and choose as to what laws shall or shall not be enforced, we are confronted with the factual situation that the several states would be left helpless to protect themselves if they are excluded by the doctrine of preemption. They would be left to the mercy and whim of the United States Attorney General. The rationale of preemption and its application to this case would therefore result in nothing more than the startling result that one man—the United States Attorney General—would hold practically dictatorial sway over the protective measure and possible life of each state government. To say that a state government may not protect itself against subversive activities and that the United States Attorney General may, at his whim, determine whether or not he desires to protect the states, is something beyond the wildest dreams of the framers of the Constitution. In other cases involving a confrontation of expanding federal power, the apprehension expressed by Thomas Jefferson has been quoted:

> "The great object of my fear is the Federal Judiciary. That body, like gravity, ever acting with noiseless foot, and in alarming advance, gaining ground step by step, and holding what it gains, is engulfing insiduously the [State] governments into the jaws of that which feeds them." [Thomas Jefferson to Spencer Roane (1821)]. *Dombrowski* v. *Pfister* (1964), 227 F. Supp. 556.

It is next argued that the language of the Act in question is vague and indefinite, particularly because it has no required element of "knowledge or intent" set forth therein. Part of the language of the statute (Sec. 5) says:

" . . . and every person *voluntarily* participating therein by his presence, aid or instigation, shall be guilty of a felony. (Our italics)

A voluntary participation, of course, involves knowledge and intent. Nevertheless, we feel this question is fully disposed of in the case of *Dennis* v. *United States, supra,* where the same point was raised. The Court said:

" . . . The structure and purpose of the statute demand the inclusion of intent as an element of the crime. Congress was concerned with those who advocate and organize for the overthrow of the Government."

The Court held that the statutory interpretation required the essential element of intent be proved "nor does the fact that there must be an investigation of a state of mind under this interpretation afford any basis for rejection of that meaning."

The statute, in our opinion, is not defective on the ground that it fails to specifically state the prohibited act must be done with guilty knowledge and intent. Such condition is to be inferred and it is therefore not vague and uncertain in that respect. See also: *Scales* v. *United States* (1961), 367 U. S. 203, 81 S. Ct. 1469, 6 L. Ed. 2d 782, rehearing den. 366 U. S. 978, 81 S. Ct. 1912, 6 L. Ed. 2d 1267.

Finally it is urged that since the Act in question provides that assembling for the purpose of advocating "that the government of the United States, or the state of Indiana, should be overthrown . . . ", the portion relating to the State of Indiana is

not severable from that applicable to the United States. The word "or" is used in the disjunctive sense, indicating that various parts of the sentence which it connects are to be taken separately. 26 I. L. E., *Statutes,* §120, p. 328; Funk & Wagnall's, *Standard Dictonary* 827 (1956 ed.).

It is well settled that such construction must be given the language in the statute above. Section 10 of the Act further provides:

> "If any . . . clause of this act shall for any reason be held invalid or unconstitutional by any court of competent jurisdiction the same shall not affect the validity of this Act...."

It is the duty of the Court to uphold the Acts of the legislature if possible by following reasonable rules of construction which will lead to that result. *Book* v. *State Office Bldg. Comm. et al.* (1958), 238 Ind. 120, 149 N. E. 2d 273; *Blue* v. *State ex rel. Brown* (1934), 206 Ind. 98, 188 N. E. 583, 91 A. L. R. 334; *State* v. *Dearth* (1929), 201 Ind. 1, 164 N. E. 489.

In our opinion, the Act is severable as to that portion applicable to the United States Government.

The judgment and order of the trial court sustaining the motion to quash the indictment and discharging the appellees is reversed and the trial court is directed to overrule the motion to quash; and for further proceedings consistent with this opinion.

Myers and Achor, JJ., concur.

Landis, J., not participating.

Jackson, J., dissents with opinion.

### DISSENT

JACKSON, J.—I am in disagreement with not only

the conclusions but the language of the majority opinion and dissent thereto.

I think that in order to determine the issues presented in the case at bar the statute under which this prosecution was initiated should be set out. The statute being the Acts of 1951, ch. 226, §1, et seq. as found in §§10-5201 to 10-5209 Burns' 1956 Replacement reads as follows:

"§10-5201. Public policy—Protection from Communism.—It is hereby declared to be the public policy of the state of Indiana and of this act [§§10-5201—10-5209] to protect the peace, domestic tranquility, property rights and interests of the state of Indiana and the people thereof from the tenets of the ideology known as Communism as the same is known and presently exists in the world today. [Acts 1951, ch. 226, §1, p. 646]

"10-5202. Public policy—Extermination of Communism.—It is further declared to be the public policy of the state of Indiana, and of this act [§§10-5201—10-5209] to promote and to enforce the Constitution of the United States of America, the constitution of the state of Indiana, and all laws passed pursuant thereto guaranteeing and defining the rights of all free Americans and, to that end, to exterminate Communism and communists, and any or all teachings of the same. [Acts 1951, ch. 226, §2, p. 646.]

"10-5203. Definitions.—For the purpose of this act [§§10-5201—10-5209], the term Communism or communist as herein defined shall include, but shall not be limited to the Communist political party as it presently exists. The Communist party for the purpose of this act is hereby defined as an organization which engages in or advocates, abets, advises, or teaches, or has a purpose which is to engage in or advocate, abet, advise, or teach, activities intended to overthrow, destroy or alter, or to assist in the overthrow, destruction, or alteration of the constitutional form of the government of the United States, or of the State of Indiana, or of any political subdivision thereof, by

revolution, force or violence. [Acts 1951, ch. 226, §3, p. 646.]

"10-5204. Membership in Communist party or similar organization unlawful—Advocating overthrow of government unlawful.—(A) It shall be unlawful for any person to be a member of the Communist party or of any party, group, or organization which advocates in any manner the overthrow, destruction or alteration of the constitutional form of the government of the United States or of the state of Indiana, or any political subdivision thereof by revolution, force, violence, sedition, or which engages in any un-American activities.

(B) It shall be unlawful for any person by word of mouth or writing to advocate, advise or teach the duty, necessity, or propriety of overthrowing or overturning the government of the United States or of the state of Indiana or any political subdivision thereof by force or violence; or print, publish, edit, issue or knowlingly circulate, sell, distribute or publicly display any book, paper, document or written or printed matter in any form for the purpose of advocating, advising or teaching the doctrine that the government of the United States, or of the state of Indiana, shall be overthrown by force, violence or any unlawful means. [Acts 1951, ch. 226, §4, p. 646.]

"10-5205. Unlawful assembly.—Whenever two [2] or more persons assemble for the purpose of advocating or teaching the doctrine that the government of the United States, or of the state of Indiana, should be overthrown by force, violence or any unlawful means, such an assembly is unlawful, and every person voluntarily participating therein by his presence, aid or instigation, shall be guilty of a felony. [Acts 1951, ch. 226, §5, p. 646.]

"10-5206. Liability of editor or proprietor of a book or newspaper—Defense.—Every editor or proprietor of a book, newspaper or circular and every manager of a partnership or incorporated association by which a book, newspaper, or circular, is issued, is chargeable with the publication of any matter contained in such book, newspaper or circular. But in every prosecution therefor, the defendant may show in his defense that the mat-

ter complained of was published without his knowledge or fault and against his wishes, by another who had no authority from him to make the publication and whose act was disavowed by him as soon as known. [Acts 1951, ch. 226, §6, p. 646.]

"10-5207. Public officers or employees not to be communists—Discharge.—No person shall hold public office or be employed by any department, board, bureau, commission, institution or agency of the state of Indiana, or any of its political subdivisions, who is a member of the Communist party or participating in any of the activities declared unlawful by this act or has been convicted under any of the provisions of section 4 [§10-5204] of this act and any person now employed by any department, board, bureau, commission, institution or agency of the state of Indiana or any political subdivisions, who is a member of the Communist party or who is engaged in any of the activities declared unlawful by this act shall be forthwith discharged. Evidence satisfactory to the head of such department, board, institution or agency of the state of Indiana or any of its political subdivisions shall be sufficient for refusal to employ any person or cause for discharge of any employee for the reasons set forth by this section. Any person discharged or refused employment under the provisions of this section shall have the right to judicial review provided for by chapter 365 of the Acts of 1947, being an act entitled 'An Act concerning the proceedings, orders and determinations of state officers and agencies and judicial review thereof' approved March 14, 1947 [§§63-3001—63-3030]. [Acts 1951, ch. 226, §7, p. 646; 1953, ch. 93, §1, p. 274.

"10-5208. Penalty for violation.—Any person violating any of the provisions of section 5 [§10-5205] of this act shall be guilty of a felony and shall, upon conviction, be disenfranchised and rendered incapable of holding any office of profit or trust and shall be imprisoned in the Indiana State Prison for not less than one [1] year nor more than three [3] years. Acts 1951, ch. 226, §8, p. 646; 1953, ch. 93, §2, p. 274.]

"10-5209. Constitutional rights unaffected.—No provision of any section of this act [§§10-5201 —10-5209] shall be construed to prohibit any right protected by the federal constitution or the constitution of the state of Indiana, including but not limited to rights of freedom of speech, freedom of the press and freedom of religion. [Acts 1951, ch. 226, §9, p. 646.]"

A reading of the above statute clearly and indisputably shows it to be unconstitutionally vague. A statute, invoking the police powers of the State in order to provide for internal security and public safety, and thereby impinging upon the constitutionally protected areas of free speech and assembly must so clearly .and specifically define the proscribed acts as to leave no doubts as to the nature of the offense and the charge to be met by the defendant. *Herndon* v. *Lowry* (1937), 301 U. S. 242.

The judgment of the trial court is correct and the same should be affirmed.

NOTE.—Reported in 203 N. E. 2d 821.