### In re the MENTAL COMMITMENT OF M.P.

#### No. 2–1185A355.

Court of Appeals of Indiana, Second District.

Nov. 18, 1986.

Rehearing Denied Dec. 22, 1986.

Kenneth J. Falk, Diana Mitchell, Legal Services Organization of Indiana, Inc., Indianapolis, for appellant.

Linley E. Pearson, Atty. Gen., Robert S. Spear, Chief Counsel, Office of Atty. Gen., Indianapolis, for appellee.

CONOVER, Presiding Judge (Sitting by Designation).

M.P. appeals the Marion Municipal Court, Room No. 3's order continuing his regular commitment to Central State Hospital and allowing the State to forcibly medicate him with antipsychotic medications.

We affirm.

ISSUES

This appeal presents the following issues:

1. whether the trial court's finding M.P. is mentally ill and gravely disabled is supported by clear and convincing evidence, and

2. whether the court erred by determining M.P. could be forcibly medicated with antipsychotic medications having the possi-

bility of serious side effects because the evidence did not show M.P. was immediately dangerous to himself and others.

FACTS

M.P. is a 28–year-old male with a history of hospitalizations and treatment for mental illness for more than two years. Currently, he is involuntarily confined to Central State Hospital. He was admitted in March, 1984, then put on out-patient status, but has been an in-patient continuously since August, 1984. He has never been adjudicated an incompetent.

In the recent past, M.P. has had severe delusions and has attempted suicide. Currently, his psychiatrist at Central State Hospital, Dr. Stoner, diagnoses M.P.'s problem as chronic undifferentiated schizophrenia: "Right now it is not as bad as it could be; but it's not perfect either, not well enough to leave the hospital." M.P. is not currently dangerous. He is unable to meet his basic needs, has no income, is not employable, and has no suitable plans in the event of his release. If released, he plans to go to the Salvation Army because he has no other place to stay, and to live on food stamps until he can get a job.

On one occasion while off his medication, M.P. grabbed another patient by the throat. Another time he was found with a butter knife in his possession.

Prior to his annual review hearing, M.P. began to refuse his medications after consulting a lawyer. Afterwards, his mental condition began to deteriorate. When he did cooperate and take his medicine, his condition improved, and he was able to think more clearly. If he would cooperate and continue taking his medication he could eventually leave the hospital as has been the case in the past, his psychiatrist believes.

Further facts as necessary appear below.

DISCUSSION AND DECISION

M.P. first attempts to challenge both the sufficiency of the evidence to sustain the trial court's findings of fact and the sufficiency of the findings to sustain the judgment, then the admissibility of his relatives' testimony concerning his aberrant behavior prior to his hospitalization. These issues are waived.[1]

### 1. *"Clear and Convincing" Evidence Standard.*

#### A. *Standard in Trial Courts.*

To satisfy federal due process requirements the State must prove the defendant's mental condition requires him to be hospitalized and treated for the protection of himself and the public by "clear and convincing" evidence. *Addington v. Texas* (1979), 441 U.S. 418, 432–433, 99 S.Ct. 1804,

---

1. M.P. attempts to challenge the sufficiency of the trial court's findings numbered 3, 4, 5, 10, and 17 through 20, to support the judgment. However, he in fact argues the insufficiency of the testimony of certain witnesses to support the judgment. Next, he alleges insufficiency of the evidence to support certain of the trial court's findings. These alleged errors are waived, however, because M.P. does not cite us to the pages in the record where the questioned testimony appears. Further he does not cite cogent authority supporting his insufficiency claims. Failure to set out such citations in an appellant's brief waives the issues attempted to be raised. *Gibralter Mutual Ins. Co. v. Hoosier Ins. Co.* (1985), Ind.App., 486 N.E.2d 548, 554; *Terre Haute First National Bank v. Stewart* (1983), Ind.App., 455 N.E.2d 362, 267. We will not search the record to reverse the trial judge. *Stewart*, 455 N.E.2d at 367; *Jones v. City of Logansport* (1982), Ind.App., 439 N.E.2d 666, 668.

M.P. made an attempt to correct this omission by several citations to appropriate testimony in his reply brief. This repair work is to no avail, however. Attempts to correct deficiencies in an appellant's reply or rehearing brief come too late. The appellant will not be permitted to reopen his appeal in this fashion. *Board of Commissioners of St. Joseph County v. Tinkham* (1986), 491 N.E.2d 578, 580; *Jones*, 439 N.E.2d at 668.

Next, M.P. attempts to challenge the admissibility of the testimony of M.P.'s relatives as to his aberrant behavior prior to his hospitalization. Again, no citations to the specific pages of the record where this testimony may be found appear in his brief, nor is cogent authority cited to support his contentions. For these reasons, these issues are also waived. *Gibralter, Stewart,* and *Jones, supra.*

1812–1813, 60 L.Ed.2d 323. However, the *Addington* court left it to the states to determine whether a greater evidentiary burden should be imposed upon the state, acting in its capacity as *parens patriae,* before enforced hospitalization could be ordered.

Our Supreme Court recently discussed the clear and convincing evidence standard. In *Orkin Exterminating Co. v. Traina* (1986), Ind., 486 N.E.2d 1019, a punitive damages case, Justice Prentice, speaking for a unanimous court [Shepard, J. not participating] said

> In *Travelers Indemnity Co. v. Armstrong,* [ (1982) Ind., 442 N.E.2d 349] *supra,* we established the "clear and convincing evidence" standard ... a standard which is but minutely below the "reasonable doubt" standard, because such actions are more akin to criminal actions than to civil suits,.... *The rule is nothing more than the rule applicable in criminal trials resting entirely upon circumstantial evidence, i.e. the evidence must exclude every reasonable hypothesis of innocence.* (Emphasis supplied).

*Traina,* 486 N.E.2d 1022, 1023. *Accord, Manlove v. State* (1968), 250 Ind. 70, 77, 232 N.E.2d 874, 878. A conviction may be based solely on circumstantial evidence. *Correll v. State* (1985), Ind., 486 N.E.2d 497, 500; *Watkins v. State* (1984), Ind., 468 N.E.2d 1049, 1052. Thus, trial courts must apply "the exclusion of every reasonable hypothesis of innocence" test to the evidence before them in favor of the defendant when considering whether an allegedly mentally ill person may be hospitalized against his will under the rule in *Traina.*

### B. *Standard of Review on Appeal.*

On appeal, the reviewing court examines the record to determine whether there was substantial evidence to support the trial court's findings on each of the issuable facts or elements the State must prove in such cases beyond a reasonable doubt. *Marshall v. State* (1982), Ind., 438 N.E.2d 986, 987. When sufficiency of the evidence is at issue, we look only to the evidence most favorable to the State and all reasonable inferences to be drawn therefrom. If substantial evidence establishes each necessary element of the matter beyond a reasonable doubt, the trial court's verdict or judgment will not be disturbed. The reviewing court will not weigh conflicting evidence nor judge the credibility of witnesses. *Loyd v. State* (1980), 272 Ind. 404, 398 N.E.2d 1260, 1264. *Accord, Smith v. State* (1984), Ind., 468 N.E.2d 512 515; *Marshall,* 438 N.E.2d at 987. Finally, the *Traina* court instructs

> Whatever standard of proof is required at the trial level, if it can be said that either of two conclusions can be reasonably drawn from the evidence, it is immaterial, *upon appeal,* that one of such conclusions appears to be more likely than the other, and we are bound by the finding of the trier of fact. However, when ... the conclusion reached by the fact finder simply cannot be reasonably arrived at under the evidence, that is to say that *no reasonable person could draw such conclusion from the evidence, then the judgment* resting thereon *is contrary to law and cannot stand.* (citing cases) (Emphasis supplied).

*Traina,* 486 N.E.2d at 1022.

The trial court here satisfied *Addington's* due process requirements. Its Finding of Fact No. 2 says

> 2) The State of Indiana had the burden of proving, by *clear and convincing evidence,* that Respondent suffered from a mental illness which resulted in either the respondent's grave disability or dangerousness. (Emphasis supplied).

Our duty, then, is to review

(a) the evidence to determine whether there is substantial evidence supporting each finding of fact, then

(b) the findings as a whole to determine whether they support the conclusions reached by the trial court namely,

(1) M.P.'s hospitalization should be continued, and

(2) because M.P. currently cannot make rational choices as to his course of treat-

ment, medication to correct his condition may be forced upon him by hospital personnel.

If these were conclusions a reasonable person could draw from those findings, we will affirm. If no reasonable person could draw such conclusions, the judgment is contrary to law and cannot stand. *Traina,* 486 N.E.2d at 1022.

### 2. *Continued Hospitalization.*

#### A. *Hearsay in Business Records.*

M.P. argues it was error to admit M.P.'s hospital admission records because they contained numerous hearsay comments by his relatives who were under no business duty to make them for the record. Because they contain such hearsay, these records are inadmissible, M.P. opines, citing *Burger Man, Inc. v. Jordan Paper Products, Inc.* (1976), 170 Ind.App. 295, 352 N.E.2d 821, in support of that proposition. We disagree.

■ First, hospital records containing statements reasonably pertinent for proper diagnosis are admissible. *Breeding v. Dodson Trailer Repair, Inc.* (1984), Mo. Sup., 679 S.W.2d 281, 284–285. Dr. Stoner used these records for diagnostic purposes.

■ Next, Indiana has rejected the hearsay argument as to expert witnesses. In this state, an expert witness can draw upon all sources of information coming to his knowledge or through the results of his investigation in order for him to formulate an opinion. The hearsay an expert considers must be of a type normally found reliable and customarily relied upon by him in the practice of his profession. *Kranda v. Houser-Norborg Medical Corp.* (1981), Ind. App., 419 N.E.2d 1024, 1034, reh. den'd. 424 N.E.2d 1064; appeal dismissed 459 U.S. 802, 103 S.Ct. 23. *Accord, Breeding,* 679 S.W.2d 284–285; *Federal Rules of Evidence,* Rule 803(4).

■ Finally, business records made in the regular course of business when properly identified are admissible even though they contain hearsay, as an exception to the hearsay rule. *Burger Man, Inc.,* 352 N.E.2d at 830.

The court correctly continued M.P.'s hospitalization. *Cf.* IC 16–14–9.1–10(d).

We find no error here.

### 3. *Forced Medication with Antipsychotic Drugs.*

M.P. next argues the trial court erred by authorizing his enforced medication with antipsychotic drugs if he refuses to take them voluntarily. He claims a competent, involuntarily committed mental patient has a constitutional right to refuse medication, absent an emergency situation. The State in oral argument agrees such a constitutional right exists, but suggests the question of whether such a patient can be forcibly medicated against his will "appears to be a mixed question of constitutional law, statutory construction, and sufficiency of the evidence." Both parties indicate this question is one of first impression in this state, as indeed it is.

#### A. *The Constitutional Right to Refuse Medication.*

In recent years, this question has been the subject of much discussion. *Cf.* Anderson, *Right to Refuse Antipsychotic Medication: A Proposal for Legislative Consideration,* 17 Ind.L.Rev. 1035, 1036, (1984). The question to be answered in such cases is whether an involuntarily-committed patient has a right to refuse such medication; and if so, whether it is ever subservient to the State's duty to act as *parens patriae* [2] in his best interests.

##### 1. *The Patient's Right.*

■ Two recent United States Supreme Court decisions are dispositive of the question of whether such a patient has a "liber-

---

**2.** Defined as
Father of his country; parent of the country.... In the United States, the state, as a sovereign—referring to the sovereign power of guardianship over persons under disability; *In re Turner,* 94 Kan. 115, 145 P. 871, 872, ...;

such as minors, and insane and incompetent persons; *McIntosh v. Dill,* 86 Okl. 1, 205 P. 917, 925 [ (1922) ].
*Black's Law Dictionary,* Revised Fourth Edition, West Publishing Co.

ty interest" of constitutional proportion to refuse to take antipsychotic medications. In *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) the Supreme Court determined a mentally retarded person involuntarily committed to a state mental institution has a constitutionally protected "liberty interest" under the Due Process Clause of the Fourteenth Amendment to reasonably safe conditions of confinement, freedom from unreasonable bodily restraints, and such minimally adequate training as reasonably might be required by these interests. *Youngberg*, 457 U.S. at 315–316, 102 S.Ct. at 2458. In *Mills v. Rogers*, 457 U.S. 291, 102 S.Ct. 2442, 73 L.Ed.2d 16 (1982), decided the same day as *Youngberg*, the precise question here involved was before the Court. It assumed but did not decide the Constitution recognizes "a liberty interest in avoiding the unwanted administration of antipsychotic drugs." *Mills*, 457 U.S. at 299, 102 S.Ct. at 2448. The Supreme Court remanded *Mills* to the First Circuit for its reconsideration of the case in light of the Massachusetts Supreme Court's decision in *Guardianship of Roe* (1981), 383 Mass. 415, 421 N.E.2d 40, because it believed Massachusetts in light of the *Roe* decision might recognize liberty interests in such cases "broader than those protected directly by the Constitution of the United States." *Mills*, 457 U.S. at 303, 102 S.Ct. at 2450. Reading *Youngberg* and *Mills* together, deeming it appropriate to do so in light of the Supreme Court's remand of *Rennie v. Klein*, 458 U.S. 1119, 102 S.Ct. 3506, 73 L.Ed.2d 1381 to the Third Circuit "for further consideration in light of *Youngberg v. Romeo*" (see note 3, *infra*), we hold in Indiana, involuntarily-committed

mental patients have liberty interests protected by the Fourteenth Amendment of the United States Constitution in avoiding the unwanted administration of antipsychotic drugs.

■ Further, under Indiana law such patients are entitled to exercise their constitutional rights. IND. CODE 16–14–1.6–4 provides

(a) All persons receiving mental health services . . ., are entitled to exercise their constitutional, statutory and civil rights except for those rights which have been denied or limited by an adjudication or finding of incompetency in a guardianship or other civil proceeding.

M.P. has never been judicially declared incompetent. Thus, he has a constitutional right to refuse to take antipsychotic drugs which may have serious side effects upon him. However, such right is not absolute either under our statutes or the federal constitution.

■ No right, constitutional, fundamental or otherwise, is absolute and unlimited. *State v. Levitt* (1965), 246 Ind. 275, 203 N.E.2d 821, 824. Constitutionally guaranteed rights can be restricted if the restriction furthers a substantial governmental interest. *Avery v. Faulkner* (1984), Ind. App., 471 N.E.2d 1226, 1228; *Matter of Joseph* (1981), Ind.App., 416 N.E.2d 857, 861.

■ While agreeing in substance with this proposition, M.P. argues the State may administer antipsychotic drugs only when "without medication the patient will harm himself or others," citing *Rennie v. Klein* (1983, 3rd Cir.) 720 F.2d 266, in support of that argument.[3]

---

**3.** Because the *Rennie* case involves the precise question now before us, a short discussion of its tortured history is appropriate. The case was the Third Circuit's second consideration of that question. In its first decision, that court sitting *en banc* as a 10 judge court, determined involuntarily committed mental patients have a constitutional right to refuse antipsychotic drugs. *Rennie v. Klein* (1981, 3rd Cir.) 653 F.2d 836. It was then appealed to the United States Supreme Court. After that court decided *Youngberg v. Romeo* (1982) 457 U.S. 307, 102 S.Ct. 2452, 73

L.Ed.2d 28, also a Third Circuit case, the Supreme Court remanded *Rennie* "specifically for reconsideration in light of the Supreme Court's opinion in *Youngberg*." *Rennie*, 720 F.2d at 268. It is clear from that instruction, the Supreme Court intended *Youngberg's* "professional judgment" standard to apply to antipsychotic drug cases.

M.P.'s confidence in *Rennie* as authority for his contention is misplaced. "Whether the patient constitutes a danger to himself or others"

When the patient's constitutional right to refuse medication and the State's *parens patriae* duty to act in the patient's best interests come into direct conflict, as in this case, the fundamental question is which shall prevail, the right or the duty, albeit the potential for development of serious side effects?

Our statutes leave the resolution of that issue to the courts. IC 16–14–1.6–7 provides in involuntary treatment cases

All patients ... are entitled to be informed of the nature of the treatment ... proposed, the known effects of receiving and of not receiving such treatment ..., and alternative treatments ..., if any.... An involuntary patient ... who wishes to refuse to submit to treatment ... is entitled to petition the committing court or hearing officer for consideration of the treatment or program. In the absence of such a petition, the service provider may proceed with the proposed treatment ...

Accordingly, in this case M.P. petitioned the lower court for review of the State's proposed treatment. This judicial review process satisfies the first prong of our federal constitution's Fourteenth Amendment Due Process requirements in such cases because it provides for judicial hearing by an independent decision maker. Such hearing, coupled with our procedural rules providing the opportunity for written findings upon the evidence presented, and appellate review of a court's judgment by this one fully meet federal due process requirements. *Cf.* Ind. Rules of Procedure, Trial Rules 1 and 52; and Ind. Rules of Procedure, Appellate Rule 4(B). *Vitek v. Jones*, 445 U.S. 480, 495–496, 100 S.Ct. 1254, 1265, 63 L.Ed.2d 552 (1980); *Morrissey v. Brewer*, 408 U.S. 471, 487–488, 92 S.Ct. 2593, 2603, 33 L.Ed.2d 484 (1972). However, that is not the end of the matter. Substantive due process also requires the exercise of "professional judgment" before such patient's liberty interest may be overborne.

is a New Jersey state standard, not the federal

The *Youngberg* "professional judgment" rule, followed in *Rennie*, was stated thusly by the Supreme Court:

In determining whether a substantive right protected by the Due Process Clause has been violated, it is necessary to balance "the liberty of the individual" and "the demands of an organized society." (citing cases) In seeking this balance in other cases, the Court has weighed the individual's interest in liberty against the State's asserted reasons for restraining individual liberty. (citing cases) * * * [W]e upheld those restrictions on liberty that were reasonably related to legitimate government objectives and not tantamount to punishment. * * We think the standard articulated by Chief Judge Seitz affords the necessary guidance and reflects the proper balance between the legitimate interests of the State and the rights of the involuntarily committed * * *. He would have held that "the Constitution only requires that the courts make certain that professional judgment in fact was exercised. It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made." 644 F.2d [147], at 178 [3rd Cir.1980]. *Youngberg*, 457 U.S. at 320–321, 102 S.Ct. at 2460–2461.

Finally, federal due process also requires "clear and convincing" evidence of the necessity to administer antipsychotic drugs before the trial court is warranted in overriding the patient's constitutional right to refuse such drugs. *Addington*, 441 U.S. at 432–433, 99 S.Ct. at 1812–1813. Our final consideration on review, then, is whether substantial evidence of probative value sufficient to exclude every reasonable hypothesis such drugs should not be administered was before the trial court so as to warrant the entry of such judgment. If no reasonable person could draw the conclusion reached by the court below upon the evidence before it, we must reverse because such judgment "is contrary to law and cannot stand." *Traina*, 486 N.E.2d at 1022.

one announced in *Rennie, supra.*

## 2. *Evidence Sufficient to Warrant Forced Medication*

 The court below found

a) M.P. cannot make rational choices regarding his own care. (Finding No. 20),

b) Without medication, Dr. Stoner believes M.P.'s condition will stay the same or deteriorate; with medication, he would be more able to cooperate in therapy. Such cooperation would lead to his discharge sooner. (Finding No. 5). It is Dr. Stoner's opinion the benefits from the medication outweigh the disadvantages to him. M.P. argues because the court's findings do not demonstrate M.P. is not currently dangerous to himself and others nor likely to become so, the evidence and findings do not support the court's judgment forced medication is warranted in this case. We disagree.

In addition to the trial court's findings regarding Dr. Stoner's testimony, it found

a) while on medication at LaRue Carter hospital he did better than he had before his admission there (Finding No. 3),

b) after his release from LaRue Carter in 1983 on medication, while off his medication he got worse, becoming wild, religiously fanatic, hallucinated and was delusional, (Finding No. 3),

c) he believed at that time there were "devils in his body," he carried a knife, cut himself with a razor blade, and considered the medical staff to be devils. He needed to be restrained by the staff. (Finding No. 4).

M.P.'s history of improvement while on medication, and Dr. Stoner's opinion the benefits of medication outweigh the disadvantages to him constitute substantial evidence the drugs should be administered. The side effects of shaking resulting from these drugs presumably will be countered with antiparkinsonian medications.

The trial court's conclusion also satisfies federal due process because

a) the trial court deferred to the judgment of a qualified professional, Dr. Stoner, and

b) since Dr. Stoner is a qualified professional, his opinion is entitled to a presumption of correctness.

*Youngberg*, 457 U.S. at 325, 102 S.Ct. at 2462. There is substantial evidence, both direct and circumstantial, of probative value on each material element of the matter at issue. Further, we believe the trial court reached the conclusion any reasonable person would reach under the same or similar circumstances. Thus, the trial court's judgment is not contrary to law.

Affirmed.

BUCHANAN, C.J., concurs.

SULLIVAN, J., dissents with separate opinion.

SULLIVAN, Judge, dissenting.

I respectfully dissent. Before addressing the substantive issue, however, I deem it appropriate to voice disagreement with the majority's framing of the standard of proof applicable in the case before us. Unnecessarily and mistakenly, my colleagues use interchangeably various standards of proof. They seem to acknowledge that the State must prove the need to deny the patient's right to refuse medical treatment by clear and convincing evidence. However, they appear to dilute this test at various points in the opinion by stating that the test is whether there is "substantial" evidence, or whether the evidence preponderates in the sense that one conclusion "is more likely than the other." At other points in the opinion, the test is made to appear more onerous in that "beyond a reasonable doubt" or "excluding every reasonable hypothesis of innocence" is the criterion.

Precise articulation of the "clear and convincing" standard is difficult if not impossible. We do know however that the standard is less burdensome than the requirement of proof beyond a reasonable doubt and somewhat more burdensome than proof by a mere preponderance. In any event, it seems inappropriate to engraft standards applicable to proof of entitlement to punitive damages as in *Orkin Extermi-*

*nating Co., Inc. v. Traina* (1986) Ind., 486 N.E.2d 1019, or to couch the test in terms of guilt or innocence as in a criminal setting. A mental patient is guilty of nothing more heinous than affliction with an illness or disease.

The majority's resolution of the substantive issue is more disquieting. To be sure, as noted by Justice Blackmun in his separate concurrence in *Youngberg v. Romeo* (1982) 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28, the State has a duty to give treatment as well as care to an involuntarily committed patient. Our own State Constitution so requires. Indiana Constitution, Art. IX, Sec. 1. That duty must be viewed, however, in the context of the patient's rights. Contrary to the holding of the majority opinion, *Youngberg v. Romeo, supra,* 102 S.Ct. at 2458, and *Mills v. Rogers* (1982) 457 U.S. 291, 102 S.Ct. 2442, 73 L.Ed.2d 16, are not dispositive of the issue before us. Nor were they intended to be.

*Mills v. Rogers, supra,* a unanimous decision, gave recognition and deference to adoption by Massachusetts of an "overwhelming state interest" test as set forth in *In Re Guardianship of Richard Roe III* (1981) 383 Mass. 415, 421 N.E.2d 40. I would adopt the same test for Indiana. Accordingly, I would reverse and remand this case for a determination whether the forcible medication of M.P. clearly and unmistakeably serves an overwhelming state interest notwithstanding the patient's strong objections to the treatment and notwithstanding the extremely adverse side effects, possibly permanent, which may ensue.

It is of particular import that the U.S. Supreme Court in *Mills* recognized that a state might impose an "overwhelming state interest" burden with regard to a mental patient who has been determined to be incompetent. It would seem that such a standard would be even more readily applicable to a patient who is not incompetent

and retains an ability, albeit somewhat limited or encumbered, to make his own decisions concerning medication. I do not perceive that the only and natural alternative to a compelling or overwhelming state interest test is lifetime warehousing of the mentally ill.

My opinion is given support by the decisions of various courts in direct response to U.S. Supreme Court remands in light of *Youngberg* and *Mills,* or even more to the point in the decision made on remand in *Mills v. Rogers* itself.[1]

Following remand by the U.S. Supreme Court (1982) 458 U.S. 1119, 102 S.Ct. 3506, 73 L.Ed.2d 1381, the Third Circuit sitting en banc in *Rennie v. Klein* (1983) 3d Cir., 720 F.2d 266, unanimously held that antipsychotic drugs could not be forcibly administered to an involuntarily committed patient under less than emergency circumstances, unless the patient constituted a danger to himself or to others. Inclusion of the Indiana "gravely disabled" condition for initial involuntary commitment, as part of the forced medication equation, would not prompt a different approach. First and foremost, without a judicial determination of incompetency, a patient involuntarily committed does not lose his right to make treatment decisions. *Rogers v. Commissioner of Dept. of Mental Health* (1983) 390 Mass. 489, 458 N.E.2d 308. Secondly, commitment and confinement for mere purposes of treatment without proof that the individual is dangerous to himself or to others is constitutionally suspect. *O'Connor v. Donaldson* (1975) 422 U.S. 563, 95 S.Ct. 2486 at 2499, 45 L.Ed.2d 396 (Burger, C.J., concurring). Furthermore, the Indiana "gravely disabled" categorization contains danger to self as an essential. *See also Rennie v. Klein, supra,* 720 F.2d at 269 and 272.

Similarly, following remand by the U.S. Supreme Court *sub. nom. Mills v. Rogers,*

---

1. The Third Circuit Court of Appeals in *Youngberg v. Romeo, supra,* merely forwarded resolution of the issue to the District Court following remand. *Youngberg v. Romeo* (1982) 3d Cir., 687 F.2d 33. I find no reported decision of the District Court on remand. However, the message of the Third Circuit in *Rennie v. Klein* (1983) 3d Cir., 720 F.2d 266, serves the same purpose.

*supra,* the First Circuit Court of Appeals considered the answers to questions as certified by the Massachusetts Supreme Court in *Rogers v. Commissioner of Dept. of Mental Health, supra,* 458 N.E.2d 308. The law of Massachusetts was restated by the First Circuit in *Rogers v. Okin* (1984) 1st Cir., 738 F.2d 1, and formed the focus of the holding that a state may require greater protections for mental patients than the minimum protections (as yet unstated by the U.S. Supreme Court) afforded by the Fourteenth Amendment.

The *Youngberg* proposition that there is "no reason to think judges or juries are better qualified than appropriate professionals in making [treatment] decisions" may not be reasonably disputed. Conversely, however, I do not believe that there can be any quarrel with the proposition that those professionals are not better qualified than judges or juries in balancing delicate constitutional rights and duties.

The Massachusetts Supreme Court in *In Re Guardianship of Richard Roe III, supra,* 421 N.E.2d 40, properly refused to abdicate the judicial prerogative to members of the medical profession. The constitutional due process balancing considerations do not permit us to relinquish our function to the medical experts. In this context, therefore, I disagree with my colleagues who hold, or at least imply, that due process requirements are met if but one qualified witness opines that forced medication is desirable.

I do not consider the right of freedom from punitive or protective bodily restraints as involved in *Youngberg* to be analagous or of persuasive influence in the case before us. As noted, the forced medication here is not sought because M.P. is dangerous to himself or others. The forced medication here is justified, if at all, upon the premise that the patient will *possibly* be able to cope more adequately with situations of day-to-day existence. The *Youngberg* inclination to defer almost completely to professionals is not, therefore, appropriate in a situation which does not involve a threat to self or to others.

*Youngberg,* however, also involved a contention by the patient that he was denied "minimal training." The Court dealt with the allegation that the state had not provided certain adequate training. In that sense it was perfectly understandable for the Court to give preferential credence to the opinion of experts as to the minimal training deemed appropriate or required.

The "minimally adequate or reasonable [treatment]" demanded and contemplated in *Youngberg* does not require forcible medication against the rational objections of the patient. Neither does the rationale of *Youngberg* logically extend to a situation such as before us.

Other post-*Youngberg* cases are also worthy of attention. In a different context, involving a criminal pre-trial detainee, but appropriate to the circumstances of a patient who has not been declared incompetent, the court in *Bee v. Greaves* (1984) 10th Cir., 744 F.2d 1387, 1392, *cert. denied* 469 U.S. 1214, 105 S.Ct. 1187, 84 L.Ed.2d 334 (1985), observed:

"The principle which supports the doctrine of informed consent is that only the patient has the right to weigh the risks attending the particular treatment and decide for himself what course of action is best suited for him.

'The very foundation of the doctrine of [informed consent] is every man's right to forego treatment or even cure if it entails what *for him* are intolerable consequences or risks, however warped or perverted his sense of values may be in the eyes of the medical profession, or even of the community, so long as any distortion falls short of what the law regards as incompetency. Individual freedom here is guaranteed only if people are given the right to make choices which would generally be regarded as foolish.' "

In *People v. Medina* (1985) Colo., 705 P.2d 961, the en banc Colorado Supreme Court made no distinction between competent and incompetent mental patients but clearly and unmistakeably set forth a strong statement in protection of the rights

of the mentally ill. Extensive quotation from that decision does not, I think, unduly belabor the issue:

"Although the decision to forcibly medicate a patient with antipsychotic drugs undoubtedly involves an aspect of professional medical judgment in connection with psychiatric diagnosis and treatment alternatives, the fact remains that the decision itself directly implicates the patient's legal interests in personal autonomy and bodily integrity. Antipsychotic medications, either alone or in combination, can cause numerous and varied side effects and carry with them the risk of serious and possibly permanent disabilities in the patient. L. Gaughan and L. LaRue, *The Right of a Mental Patient to Refuse Antipsychotic Drugs in an Institution,* 4 Law and Psychology Rev. 43, 51–56 (1978); Plotkin, *Limiting the Therapeutic Orgy: Mental Patients' Right to Refuse Treatment,* 72 Nw.U.L. Rev. 461, 474–79 (1977). The effects of these drugs can be far more debilitating to the patient than the physical restraint incident to the involuntary commitment process. Furthermore, '[t]here is virtually no evidence that antipsychotic drugs have a beneficial effect upon patients beyond the time they are in the blood stream.' L. Gaughan and L. LaRue, *supra,* at 48." 705 P.2d at 968–969.

\* \* \* \* \* \*

"The People argue that once the patient has been involuntarily committed and found to be incompetent, the patient's right to refuse treatment is adequately protected by the rules and regulations of the institution and the opportunity of the patient to seek post-treatment judicial review of the treatment decision. We find no merit whatever in this argument. Relegating the patient to a post-treatment hearing, in addition to requiring the forfeiture of the patient's interest in bodily integrity as related to the initial treatment, would compel a patient to submit to the very risks to which his refusal was most likely directed in the first instance." 705 P.2d at 971.

\* \* \* \* \* \*

"We are satisfied that the interest of both the patient and the state will be adequately served if the physician or professional person desiring to administer antipsychotic medication satisfies the court by clear and convincing evidence of the following four propositions: (1) that the patient is incompetent to effectively participate in the treatment decision; (2) that treatment by antipsychotic medication is necessary to prevent a significant and likely long-term deterioration in the patient's mental condition or to prevent the likelihood of the patient causing serious harm to himself or others in the institution; (3) that a less intrusive treatment alternative is not available; and (4) that the patient's need for treatment by antipsychotic medication is sufficiently compelling to override any bona fide and legitimate interest of the patient in refusing treatment.

Initially, the party seeking the treatment order must establish the patient's incompetency. As already noted, the fact that the patient has been involuntarily certified for mental health treatment does not by itself establish the patient's incompetency to make treatment decisions. Under our decision in *Goedecke* [v. State Dep't. of Institutions], a court is prohibited from ordering the forced medication of an involuntarily committed but competent patient unless the court is satisfied that the patient's mental illness has so impaired his judgment as to render him 'incapable of participating in decisions affecting his health.' 198 Colo. [407] at 411, 603 P.2d [123] at 125 [ (1979) ]. If the patient is competent to participate in the treatment decision, then the patient's refusal to submit to the proposed treatment must be respected out of the law's regard for a person's right to make decisions on matters affecting his own bodily integrity." 705 P.2d at 973.

\* \* \* \* \* \*

"Finally, the court must determine whether the need for antipsychotic medication is sufficiently compelling to override any legitimate interest of the patient in refusing treatment. The patient's refusal may stem from a prior unfavorable experience with similar treatment, an absolute and unequivocal religious belief or practice, advice from a family member, a personality clash with the attending physician, or any of a number of reasons. The court to the extent permitted by the evidence, must determine whether the patient's refusal is bona fide and legitimate and, if so, whether the prognosis without treatment is so unfavorable that the patient's personal preference must yield to the legitimate interests of the state in preserving the life and health of the patient placed in its charge and in protecting the safety of those in the institution." 705 P.2d at 974.[2]

*See also Large v. Superior Court* (1986) 148 Ariz. 229, 714 P.2d 399, 410 (Cameron, J., dissenting); *In Re Guardianship of Ingram* (1984) 102 Wash.2d 827, 689 P.2d 1363.

The recognition and deference given by the U.S. Supreme Court to *In Re Guardianship of Richard Roe III, supra,* 421 N.E.2d 40, would appear to acknowledge that we need not look solely to constitutional guarantees or statutes to protect involuntarily committed patients from forcible antipsychotic medication. It is an acknowledgment that the judiciary by resort to the common law may forge the needed substantive protection. *See* Note, *A Common Law Remedy for Forcible Medication of the Institutionalized Mentally Ill* (1982) 82 Columbia L.Rev. 1720.

It may be noted that the regulations of New Jersey (as constitutionally approved in *Rennie v. Klein, supra,* 720 F.2d 266) and those of Massachusetts (as approved in

*Rogers v. Okin, supra,* 738 F.2d 1) are comprehensive and specific concerning the circumstances under which medication may be forced, and the factors and procedures required for such decision. I find no rule or regulation in Indiana which provides guidance for administrative or medical decisions concerning forced medication of mental patients.[3] Accordingly, and for this reason alone, though not argued by the parties, I conclude that the practices and procedures followed in Indiana mental institutions are constitutionally deficient. Provision for review of treatment upon petition by the patient (I.C. 16–14–1.6–7) and/or annual reporting by the institution concerning care and treatment (I.C. 16–14–9.1–10 (e)) are not sufficient. A scholarly treatment of the issue and a thoughtful proposal for administrative or statutory guidelines is contained in Note, *Right to Refuse Antipsychotic Medication: A Proposal for Legislative Consideration,* 17 Ind.L. Rev. 1035 (1984).

The majority opinion does not address the State's contention that under our statute it is the patient's burden pursuant to his petition for treatment review to prove that the medication is inappropriate. To the extent the State argues that under the Indiana treatment review procedure (I.C. 16–14–1.6–7) the burden is upon the patient, I must disagree. In this respect, the posture of the case and of the burden is no different than in *Rennie v. Klein, supra,* 720 F.2d 266, and other cases in which the issue was framed by a complaint by the patient filed against the mental institution. In my view the burden remains upon the State to prove that the medication is necessary no matter how or by whom the issue is presented. Furthermore, as earlier stated, I believe the State must carry that burden by proof of an overwhelming State interest and such proof must be by clear and convincing evidence.

2. It is possible to make an argument that a patient's incompetence to effectively participate in the treatment decision should not depend solely upon a judicial determination of legal incompetency. We need not decide that question.

3. The only rule or regulation which even remotely concerns such matters is 440 IAC 1–1–21 which deals solely with mechanical restraints and seclusion for patients. It therefore appears that the Department of Mental Health has been somewhat delinquent in meeting the legislative mandate of IC 16–14–1.6–9 requiring such regulations.

"As the Supreme Court has stated, 'The individual should not be asked to share equally with society the risk of error when the possible injury to the individual is significantly greater than any possible harm to the state.' *Addington v. Texas,* 441 U.S. 418, 427, 99 S.Ct. 1804, 1810, 60 L.Ed.2d 323 (1979)." *Rennie v. Klein, supra,* 720 F.2d at 277.

In summation, I dissent because I believe the majority takes a myopic, if not erroneous, view of *Youngberg* and *Mills v. Rogers;* because the delicate balance between individual constitutional rights and the doctrine of *parens patriae* should not be the sole prerogative of the medical profession; and because the State of Indiana must assume its administrative or legislative duty to articulate standards and guidelines for the confinement and treatment of mental patients.

For all of these reasons I dissent and would reverse the judgment of the trial court.